AMANDA LARSON, Respondent, v. CLARA B. SCHMIDT RUSSELL, Appellant.

(176 N. W. 998.)

**Damages — character and extent of injury a jury question.**

In an action for personal injuries occasioned to the plaintiff by the alleged negligence of the defendant, consisting in allowing the veneered brick wall of a building to remain in such condition that it was likely to fall and injure persons in the vicinity; it appearing that the wall did fall, some of the bricks striking the plaintiff and inflicting injuries upon her head, back, and shoulders; plaintiff and experts testifying on her behalf claiming that her

NOTE.—That as a general rule the courts are reluctant to interfere with the verdicts of juries, for the reason that the law furnishing no legal rule for measuring the damages, the duty of determining the amount which should be awarded in a given case has been vested in the jury, as will be seen by an examination of the authorities collated in an exhaustive note in L.R.A.1915F, 30, on excessiveness of verdicts in actions for personal injuries other than death.

45 N. D.—3.

injury had resulted in a condition of permanent paralysis due to traumatic neurosis; the defendant and experts testifying on her behalf contending that the plaintiff's injuries were of a temporary character, and that she is not paralyzed, but afflicted with hysteria—the evidence is examined and it is *held*:

1. That the character and extent of the injuries of the plaintiff present questions of fact for the consideration of the jury.

**Appeal and error — verdict on evidence authorizing different conclusions cannot be disturbed.**

2. The evidence as to the injury being such that reasonable persons might draw different conclusions therefrom, the verdict of the jury cannot be disturbed.

**Damages — $26,000 for personal injury held not excessive.**

3. On the supposition that the plaintiff was injured as claimed, and as there is substantial evidence tending to show, the damages awarded are not excessive.

**Negligence — allowing condemned wall to remain in unsafe condition held actionable.**

4. Where a wall had been condemned by city authorities as being unsafe, and the defendant owner had full knowledge thereof, and where it is not shown that the plaintiff knew of the defects, the negligence of the defendant in allowing the wall to remain in an unsafe condition is actionable at the suit of one who was injured while rightfully on the premises.

**Landlord and tenant — lessee's obligation to make repairs held not to exonerate owner.**

5. The obligation of a lessee to make repairs which does not relate specifically to the defect causing plaintiff's injuries does not exonerate the owner of the building from liability.

### On Rehearing.

6. It was reversible error for the trial court to prevent the impeachment of certain witnesses, by refusing the defendant the right to show, upon their cross-examination, that, at the trial of certain other cases in the United States District Court, the subject-matter of which was wholly different to this, that it was found by that court that they had committed perjury in fact. It was also reversible error of the trial court, in preventing the defendant from showing, upon the cross-examination of such witnesses, what those facts were concerning which they gave such false testimony, and in denying defendant's offer of proof.

Opinion filed December 11, 1919. Judgment reversed on Rehearing February 14, 1920. Rehearing denied March 9, 1920.

Appeal from Cass County District Court, *A. T. Cole,* J.

Judgment affirmed.

*M. A. Hildreth* (*John Carmody*, of counsel), for appellant.

The verdict is excessive. It is not sustained by the evidence and indicates passion and prejudice, which vitiates the verdict; and on this ground alone a new trial should be granted. Carpenter v. Dickey, 26 N. D. 176, 143 N. W. 964; Waterman v. Minneapolis, St. P. & S. S. M. R. Co. 26 N. D. 540; Rev. Codes 1905, § 7063; Pertello v. Missouri Pacific, 117 S. W. 138; Ice Co. v. Tamm, 90 Mo. App. 202; Gibney v. Transit Co. 204 Mo. 704, 103 S. W. 43.

We think the ends of justice will be subserved by a new trial. Johnson v. Great Northern R. Co. 107 Minn. 285, 119 N. W. 1061; Landro v. Great Northern R. Co. 114 Minn. 162, 130 N. W. 553; Bucher v. Wisconsin C. R. Co. 139 Wis. 597, 120 N. W. 518; Louisville & N. R. Co. v. Reaume, 107 S. W. 290; Gibney v. St. Louis Transit Co. 103 S. W. 43.

No verdict of the size of the verdict in this case should be permitted to stand based upon such testimony. Johnson v. Great Northern R. Co. 107 Minn. 285, 119 N. W. 1061; DePow v. Chicago & N. W. R. Co. 138 N. W. 43; Schwartzbaeur v. Great Northern R. Co. 112 Minn. 356, 128 N. W. 286; Oberg v. N. P. R. Co. 136 Fed. 981.

The opinion of the experts for the plaintiff that she was permanently injured was not based on anything substantial, but was purely speculative. Bucker v. Wisconsin C. R. Co. 139 Wis. 597, 120 N. W. 518; Morrison v. Northern P. R. Co. 74 Pac. 1064; Goken v. Dallugge, 99 N. W. 819; Goken v. Dallugge, 103 N. W. 287.

To entitle a plaintiff to recover present damages, for apprehended future consequences, there must be such a degree of probability of their occurring as amount to a reasonable certainty that they will result from the original injury. Curtis v. Rochester & S. R. Co. 18 N. Y. 541; Filer v. New York C. R. Co. 49 N. Y. 45; Clark v. Brown, 18 Wend. 229; Lincoln v. Saratoga & S. R. Co. 23 Wend. 435; Strom v. New York L. R. & W. R. Co. 96 N. Y. 305; Shoemaker v. Sonji, 15 N. D. 518, 108 N. W. 42; Elzig v. Bales, 112 N. W. 540; Chicago M. & St. P. R. Co. v. Lindeman, 143 Fed. 946; Hemenway v. Washington Water Power Co. 95 Pac. 269; Louisville & N. R. Co. v. Reaume, 107 S. W. 290.

Considering the plaintiff's earning capacity the verdict was excessive and unreasonable. Louisville & N. R. Co. v. Reaume, supra;

Louisville Southern R. Co. v. Minogue, 12 Ky. L. Rep. 378, 14 S. W. 357; Rooney v. New York N. H. & H. R. Co. 53 N. E. 435; Peterson v. Roessler & H. Co. 131 Fed. 156.

BIRDZELL, J.   This is an action to recover damages for personal injuries alleged to have been sustained by the plaintiff through the falling of a portion of the wall of a building owned by the defendant. It appears that on February 3, 1915, the plaintiff was working in the capacity of a domestic servant, in the rooming house occupying a building known as the Ely Block and Annex on Broadway in the city of Fargo.   The portion of the building which was used as a rooming house had been leased to her brother-in-law, one Papas or Papamanoles, and the lease assigned by the latter to Emma Larson, the mother of the plaintiff.   On the date mentioned, while the plaintiff was thus employed, she had occasion to go down the steps of a stairs on the out- side at  the rear of the building, and while making the descent a sec- tion of the veneered brick wall fell out, some of the bricks striking the plaintiff and inflicting injuries upon her.   The case was tried in the district court of Cass county in January, 1918, and a verdict rendered in favor of the plaintiff for $26,000.   The defendant later moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial.   This appeal is from the order of the trial court deny- ing a new trial and from the judgment entered on the verdict.   Upon this appeal the appellant has made ninety-four assignments of error. It will be unnecessary to consider all of the assignments, but such of them will be referred to as appear to have most merit.

It is first contended that the verdict is so excessive as to indicate that it was rendered under the influence of passion or prejudice, thus necessitating a new trial.   Comp. Laws 1913, § 7660.   The argument in support of this contention concerns itself with two main proposi- tions:   (1) That the evidence is insufficient to establish that the plain- tiff suffered a permanent injury; and (2) assuming such permanent injury to have been established, the plaintiff had not sufficient earn- ing capacity to warrant a verdict for the sum given.   The proper weighing of this contention has involved a painstaking examination of the record by every member of this court, and has led to the forma- tion of different conclusions therefrom.   A statement of the facts

which the record discloses, bearing upon the physical condition of the plaintiff, according to the views of the majority of the court, shows that a question of fact was presented for the consideration of the jury and that their verdict in response to it is one that finds substantial support in the evidence.

At the time the plaintiff received the injury she was twenty-two years of age. She enjoyed good health and was receiving for the work that she had been doing $25 per month and her room and board. On the day of the accident the plaintiff's brother found her lying at the bottom of the stairway at the rear of the building in an unconscious condition with the bricks from the fallen wall lying upon and about her. She was carried to a room in the building bleeding at the mouth and nose and upon her back there was a bruised area over the spinal column and about the shoulder blades. A doctor was at once called to attend her and up to the day of the trial she had been constantly under the care of this physician. Between the date of the injury and the date of the trial, a period of approximately three years, the plaintiff had been bedfast and in a paralyzed condition which her doctor described as traumatic neurosis. This disease is attributed to the injury in question and the diagnosis of its presence is positive. The defendant, on the other hand, and experts testifying on her behalf, contend that the plaintiff is afflicted with hysteria; that she has no traumatic neurosis and no motor paralysis; that she would be able to move about in a normal way if she willed to do so.

The condition of the plaintiff was presented to the jury by the testimony of six doctors who had observed her, by a nurse, her relatives who had attended her, and by herself, she being present during the trial and giving testimony from a cot upon which she was carried back and forth. The physician who saw her first was Dr. J. W. Vidal, a homeopathic physician who had been graduated from the University of Michigan and who had had thirty-four years of experience. At the time he first saw her, which was about noon on the day of the accident, he says that she apparently could not move any part of her body, and that she apparently did not understand anything he said to her; that she was perfectly placid and couldn't move; that from the date of the accident to the date of the trial he had visited her about two hundred and fifty times; that he was assisted in the treatment by Mrs. Nelson,

a nurse, who had applied hot packs to the spine and massaged her with the hand and a vibrator, followed by alcohol rubs and the use of a chemical light known as "lucredescent" light. In treating her he had observed her inability to move her body to the extent that if, in turning her, her face should be turned directly on to the pillow, she would smother, as she couldn't move from that position to enable her to breathe. But notwithstanding the motor paralysis described by Dr. Vidal, he also testified that, according to his observations, the plaintiff suffered great pain when various portions of her body were touched, as, for instance, when soliciting the patella reflex or in moving the head. He testified that in his opinion the patient was suffering from what he termed spinal neurosis, and that she was permanently injured. The peculiarity of her condition is that the posterior motor nerves are paralyzed, while the sensory nerves are not paralyzed but are exaggerated.

Dr. Francis Peak, a homeopathic physician of thirteen years' experience, testified in detail concerning the examination he made of the patient, and not only confirmed the diagnosis given by Dr. Vidal, but gave a scientific explanation of the possibility of there being a paralysis of the motor nerves without accompanying paralysis of the sensory nerves.

Dr. Olaf Hagen, of Moorhead, Minnesota, a graduate of the University of Minnesota and a practitioner of eleven years' experience, also testified confirming the diagnosis.

Three doctors called by the defendant testified as experts. They were Drs. McGregor, Sorkness, and Wheeler. These men likewise possessed the usual qualifications, and they testified as to their observations from personal examination of the plaintiff, as well as in response to hypothetical questions. The principal point of difference between the opinions of the experts testifying at the instance of the defendant and those testifying for the plaintiff is as to the possibility of there being a condition of paralysis affecting the motor nerves which does not at the same time affect the sensory nerves. Dr. McGregor, for instance, testified that as a general proposition a paralyzed individual cannot experience pain, and that he didn't think that a woman suffering from paralysis as a result of a traumatic injury could be so paralyzed as to lack power of locomotion and yet suffer more or less pain. This opin-

ion is based upon the fact that the nerve fibers in the spinal column are so intermingled that it would be impossible for traumatism to injure the motor nerves without likewise injuring the sensory nerves, and he therefore did not consider it possible for an individual to suffer the pain that the plaintiff claims to have suffered if she was paralyzed to the extent of being unable to move. Other conditions testified to by this witness, upon which he based his opinion that the plaintiff was not paralyzed, were that the patella reflexes were exaggerated, that the muscles of the body had not atrophied, that there were no bed sores on the body, and that the plaintiff's body was apparently well nourished. He also testified that even if a condition existed in which the motor nerves were affected, and not the sensory nerves, it could not exist for any length of time, for either the nerves that were injured would be repaired, or those that were so injured that they could not become normal again would be so completely paralyzed that there would be no sensation, pain, or motion. Dr. Sorkness expressed opinions similar to those of Dr. McGregor, as did also Dr. Wheeler. These doctors agree in the opinion that there is no paralysis of either the motor or the sensory nerves. Dr. Wheeler, however, said that it was possible to have paralysis and pain at the same time. These doctors account for the then condition of the plaintiff as being due to hysteria, neurosis, or self-suggestion, and they regard her contribution to her own condition as being a certain extent unconscious. It is their opinion that such injuries as she sustained were of a temporary character.

Upon this testimony this court is asked to set aside the verdict of the jury on the ground that it lacks the requisite support to justify a finding of permanent injury and damages based thereon. The record impresses us, as the testimony might have impressed the jury, with a degree of uncertainty as to the true condition of the plaintiff, but we are not warranted in disturbing the verdict of the jury on the ground that there is some uncertainty as to the character of the injury. The extent of the injury is a question of fact, and, like other questions of fact, is to be determined by the jury, and not by the court. It is only when the evidence is of such a character that reasonable minds can draw but one conclusion therefrom that the court is justified in pronouncing the conclusion. If the jury believed the witnesses for the plaintiff and if they were so impressed by her demeanor during the

trial as to believe that she was in fact injured as claimed, we cannot say on this record that such is impossible or that the jury should have found otherwise. There being ample evidence upon which to base the verdict, in so far as the verdict may involve a finding of permanent injury, it cannot be disturbed by this court upon appeal. The responsibility for this verdict, under our existing jurisprudence, clearly rests upon the jury and, under our procedure, where no error has been committed warranting a reversal, we know of no method according to which a case of this character may be so tried as to shift the responsibility for the determination of the difficult questions of fact from the shoulders of the jury to those of the judge. The testimony amounts to legal evidence and has apparently been sufficient to carry conviction to the mind of the jury. There is no rule of law that requires testimony in cases of this character to do more than this. Furthermore, the trial judge had the same opportunity to observe the witnesses and to weigh their testimony that the jury had and he was evidently so far impressed with the testimony as a whole to feel justified in exercising his discretion in favor of the plaintiff upon the motion for a new trial.

The peculiarity of this case is only that the facts are difficult to determine. But mere difficulty in determining facts does not give rise to any different procedure or call for the application of any different legal principles than such as apply ordinarily. This is not a case such as Johnson v. Great Northern R. Co. 107 Minn. 285, 119 N. W. 1061, where the plaintiff's witnesses acknowledged that they were not experts on nervous conditions, and where the defendant produced experts who were capable of giving and who did give complete scientific explanations of the plaintiff's symptoms, which could lead only to the conclusion that there was no appreciable injury to the nervous system. On the contrary, it is a case where, so far as the record discloses, the experts testifying for both the respective parties were equally qualified to express opinions concerning the plaintiff's condition. Thus, while in view of the possibilities of simulation, policy might dictate a close scrutiny of testimony going to establish permanent nervous disorders, we cannot lose sight of the fact that the law does not purport to determine questions peculiar to physiological science. Neither it is possible to lay down rules according to which injustices due to verdicts of juries on questions of fact can be obviated in all cases. Verdicts which

by subsequent demonstration may be found to be unjust may nevertheless be of unquestionable legal validity. This may work to the disadvantage of either party, for wrongs are perhaps as likely to result from the denial by juries of substantial damages for real injuries as from awards for injuries which prove to be less serious than anticipated. If, for instance, the jury in the instant case had credited the testimony of the experts who testified for the defendant and had rendered its verdict accordingly, there can be no doubt that the plaintiff would not have been entitled to another trial. And her right would be no different, though she should remain for life a helpless paralytic. With the development of medical science it may become possible to set up more satisfactory standards for the diagnosis of nervous disorders, and this may in turn result in preventing imposition upon courts and juries such as occasionally occur; but in the light of present standards and on the record before us the majority of this court is of the opinion that it is not warranted in saying that the jury was imposed upon in the instant case.

We have examined the authorities relied upon by the appellants, in which verdicts for substantial damages were set aside on the ground that the evidence did not show to the requisite degree of certainty that the injuries were permanent. But these authorities are not applicable in the instant case, for if the plaintiff's condition has been properly diagnosed by the experts who testified on her behalf, there can be little doubt of the permanency of the injuries. Such doubt as there is on this point arises from the disagreement of the experts concerning the character of the injury itself, rather than its effects, provided the diagnosis is correct. The witnesses for the plaintiff testify that there is a lesion of the spinal cord or a condition of traumatic neurosis. Those for the defendant say that, in their opinion, such a condition does not exist. For this court to say, then, that the plaintiff has not sustained the burden of proof as to the permanency of her injuries would involve the usurpation of the functions of the jury in weighing testimony upon a disputed fact relating to an existing condition. Dickinson v. McBride, 127 Ark. 555, 193 S. W. 89; St. Louis & S. W. R. Co. v. Hemmert, 118 Ark. 601, 174 S. W. 222; Callicotte v. Chicago, R. I. & P. R. Co. 274 Mo. 689, 204 S. W. 529.

It has been suggested that such damages as were allowed in the in-

stant case to compensate for permanent injuries are not sufficiently certain within the rule laid down in § 7141, Comp. Laws 1913. This section reads: "Damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof, or certain to result in the future." The contention is that prospective damages recoverable can only be such as are in reality certain to result and not merely such as may be likely to result in the future. In York v. General Utilities Corp. 41 N. D. 137, 170 N. W. 312, this court reversed a judgment for error in instructions, where the trial court had instructed the jury that in estimating damages they might consider the "likelihood" of the injuries being permanent and the pain the plaintiff had suffered or "may be likely to suffer in the future." This instruction was regarded as too favorable for the plaintiff, particularly in view of the fact that the court refused the defendant's request to so limit the comparative terms "likelihood" and "likely" as to make clear to the jury that speculation and conjecture were not to be indulged in. We are of the opinion that the word "certain" appearing in the statute is not used in the absolute sense. It relates to the future, and therefore cannot be construed as only embracing those consequences or elements of damages which are absolutely certain to follow a given injury, for future happenings are necessarily somewhat uncertain. The section had its origin in the original Field Code, § 1467, Draft of Civil Code for the State of New York (1862) and the commissioners contented themselves with citations to Sedgwick on Damages, 104, and Wilcox v. Plummer, 4 Pet. 172, 182, 7 L. ed. 821, 824. Reference to these authorities discloses that the rule of damages codified by the section in question is the rule according to which all damages for a given injury must be recovered in one suit, which requires, according to the rule stated by Sedgwick, § 86, that the recovery shall embrace not only compensation for loss already sustained "but also for such loss as he (the plaintiff) can with *reasonable* certainty show will accrue in future." Sedgwick further points out that a contrary rule had formerly existed in England under which damages were allowed only to the time of the commencement of the action. Comyns's Dig. Damages, D; Pilfold's Case, 10 Coke, 115b, 77 Eng. Reprint, 1102. The clear purpose of the statute, then, was to alter this rule, and enable a plaintiff to recover damages which are reasonably certain to accrue in the future.

If more were required than reasonable certainty it can readily be seen that all recovery of prospective damages would be precluded in actions for personal injuries where the injuries have resulted in nervous disorder. For, under the present state of medical science, even the most learned and highly specialized experts do not venture to say that they can assuredly foretell the probability of recovery. The adjudicated cases, fully sustain the proposition that recovery may be had as for permanent injury in cases of traumatic neurosis, even though there may be some likelihood of recovery. St. Louis & S. W. R. Co. v. Hemmert, 118 Ark. 601, 174 S. W. 222; Louisville & S. R. Co. v. Minogue, 90 Ky. 369, 29 Am. St. Rep. 378, 14 S. W. 357; Dickinson v. McBride, supra; Callucotte v. Chicago, R. I. & P. R. Co. supra.

In fact, the rule seems to be well established that courts are somewhat more reluctant in cases of this character to disturb the verdicts of juries than in cases where they can more readily weigh and determine the elements having a legitimate bearing in estimating damages.

Says Cyc. (13 Cyc. 129–132):

"In cases of paralysis or injury to the nervous system a verdict will rarely be considered excessive. So in injuries to the spine that have resulted from a personal injury, the court is little inclined to interfere with a verdict on the ground that it is excessive.

"Where it appears from the evidence that the injury complained of has proved or is liable to prove permanent, the appellate courts are little inclined to interfere on the ground of excessive damages. Indeed the courts have gone so far as to refuse interference on the ground of excessive damages not only where there is a probability of permanent injury, but where the evidence shows that a possibility exists. Even where the evidence is conflicting as to the permanency of the injury or where the recovery is doubtful the courts will not set aside a verdict of excessive." See also 17 C. J. 1087, § 397.

Under the evidence in this case pain and suffering, both past and prospective, were also proper elements of damage. 8 R. C. L. 544. Without expressing an opinion as to the degree of certainty of permanent injuries required to support a verdict, we are of the opinion that there is substantial evidence in this case to support the verdict of the jury in its entirety and that the case falls well within the principles supported by the authorities above referred to.

As to the contention that the verdict is excessive, viewed from the standpoint of compensation for pain and suffering, and for the loss of earning capacity upon the supposition that permanent injury has been sustained, we think little need be said. At the time this case was tried the plaintiff had undergone approximately three years of pain and suffering; had incurred considerable expense in connection with her care, and there was a strong probability that her condition would remain practically the same for the remainder of her life. She would not only be unable to earn a livelihood, but she would require the services of others to minister to her wants. This contention is therefore regarded as being without merit.

The appellant also contends that in any event no actionable negligence has been shown, and in this connection reliance is had upon the general doctrine that a landlord is not liable to those who sustain injuries caused by defects in leased premises. The provisions of the lease are pleaded. According to the lease, the lessee was to perform all labor necessary to do the carpenter work, painting, paperhanging, etc., and the lessor was to furnish the materials. In case of the failure of the lessor to furnish the materials, consisting of lumber, wallpaper, paint and glass, and other materials necessary to place the building in a first class and sanitary condition, the lessee was authorized to procure the same at the expense of the lessor. It does not appear that repairs of the character required to render the exterior veneered brick wall safe were contemplated by the parties to the lease nor embraced within their contract, but on the contrary it rather appears that the lessor assumed any obligation there might be with respect to such repairs; for it was expressly agreed that any repairs that might be required on the roof should be done by her.

The rule for which the appellant contends, according to which the landlord is held not liable to employees of the tenant, is generally applied in instances where the injury was occasioned by a defect in the premises which, as between the landlord and the tenant, the landlord was not bound to repair. It is, of course, competent for a landlord and a tenant to contract for the rental of premises in their existing condition and for the tenant to assume the burden of rendering them safe and habitable. Under such an arrangement those who may come upon the premises during the lease would be there at the tenant's in-

vitation, so that any resulting injury would be attributable to his fault and would not involve any breach of duty owing by the landlord. Daley v. Towne, 127 Minn. 231, 149 N. W. 368; Bailey v. Kelly, 93 Kan. 723, L.R.A.1916D, 1220, 145 Pac. 556. That is not so in this case, however, as the tenant did not assume an obligation to make the repairs in question, and the defendant leased the premises knowing full well that their use would require the presence of persons who would have occasion to use the rear stairway as the plaintiff in this case was using it, and who would thereby be subject to the hazard of the defective condition of the veneered wall. It appears as a fact that the wall in question had been condemned by the city authorities as unsafe, and that the defendant had full knowledge thereof. But it is not shown that the plaintiff knew of the defective condition, nor can we assume that the condition was so obvious that it must have been known to one having no particular occasion to observe it and no skill in detecting such defects. See Russell v. Fargo, 28 N. D. 300, 148 N. W. 610; note in 50 L.R.A.(N.S.) 286.

It is also argued that the defendant was prejudiced by being denied the right to impeach the plaintiff, her mother, her sister and her brother. To impeach these witnesses, defendant's counsel sought to show upon the cross-examination of the plaintiffs brother that the plaintiff, her mother and her sister gave certain testimony in a bankruptcy proceeding in the Federal court, pursuant to a voluntary petition of the plaintiff's brother-in-law, Papamanoles, and in a trustee's action set aside certain conveyances and mortgages executed by the bankrupt, which testimony was so incredible that it was not believed by the Federal judge who found as a fact that the parties referred to had committed perjury. The discredited testimony was designed to establish the bona fides of the transaction attacked by showing that the plaintiff's mother had accumulated several thousand dollars in currency which she kept in a box hidden in the cellar of her residence in Minnesota, and that this represented earnings of her sons, including the witness, which had been sent to her from time to time. In the offer it was stated that this case was begun shortly after the rendition of the adverse decree in the bankruptcy and trustee proceedings and the offer was made with reference to each witness and for the purpose of affecting the credibility of the plaintiff and her family.

This evidence was objected to on every ground that could affect its admissibility. Conceding that this case is one in which the broadest latitude should be given in the cross-examination of plaintiff's witnesses, we cannot view the exclusion of the evidence referred to as involving reversible error. In this jurisdiction the most liberal rules obtain for testing the credibility of witnesses on cross-examination. Territory v. O'Hare, 1 N. D. 30, 44 N. W. 1003; State v. Kent (State v. Pancoast) 5 N. D. 516, 35 L.R.A. 518, 67 N. W. 1052; State v. Malmberg, 14 N. D. 523, 105 N. W. 614. It is even held, as will be seen in State v. Malmberg, supra, that facts which affect the credibility of a witness' testimony in the specific case, as distinguished from facts affecting credibility generally, may be shown by independent evidence. It is also true that, generally, greater latitude should be permitted in testing credibility on cross-examination than in allowing independent evidence for this purpose (see 2 Wigmore, Evidence, § 954), and that the range of cross-examination is largely within the discretion of the trial court. Inquiry, however, as to specific acts indicating corruption should not be indulged in unless the facts inquired for have a direct bearing upon the credibility of the witness for the case in hand. As was held, for instance, in South Bend v. Hardy, 98 Ind. 577, 49 Am. Rep. 792, the plaintiff, who had testified in support of his own claim for personal injuries against a city, could not be cross-examined upon a prior attempt to defraud an insurance company by causing a false death claim to be presented; and in Elliott v. Boyles, 31 Pa. 65, that a witness could not be asked in cross-examination whether on another trial he had committed perjury. See also, Third Great Western Turnp. R. Co. v. Loomis, 32 N. Y. 127, 88 Am. Dec. 311; Penny v. Rochester R. Co. 7 App. Div. 595, 40 N. Y. Supp. 172, 178; Com. v. Mason, 105 Mass. 163, 7 Am. Rep. 507; 5 Jones. Ev. § 832. But where the evidence tends directly to affect the credibility of the witness in the particular cause it would be error to exclude it. See Finlen v. Heinze, 32 Mont. 354, 80 Pac. 918, where it was held error to exclude evidence tending to impeach a witness by showing that he had been an active agent in corrupting a judge on a former trial of the same case. In Beck v. Hood, 185 Pa. 32, 39 Atl. 842, where it was held proper to impeach credibility on cross-examination by showing that on a former trial of the same case the witness sought to affect the verdict by making

statements to a juror out of court. In the instant case the questions were not so framed as to admit of answers affecting credibility generally and we are of the opinion that the connection between the supposed corruption involved in the bankruptcy proceedings and that in the instant case is not sufficiently apparent to warrant us in holding that the limitation of the cross-examination in the manner indicated was an abuse of discretion amounting to error.

Error is also predicated upon a ruling of the trial court sustaining an objection to the following question asked Dr. Vidal upon cross-examination: "Has it been your experience, Doctor, in many of these cases, that if there was a verdict for the plaintiff, the party recovered and would walk?" While, in our opinion, it was proper to thus seek to test the value of the doctor's opinion, we do not regard the error as being at all serious, for the reason that ample opportunity seems to have been afforded for cross-examining the doctor as an expert and the jury was as fully enlightened upon the characteristics of neurosis as the combined evidence of the six doctors could make them.

Every feature of this case has received the most careful attention of the court, those features upon which we have entertained any doubt having been reargued at the direction of the court. We fully appreciate the possibility of injustice being done in cases of this character, but after the most painstaking consideration it appears to the majority of the court that a fair trial has been had, and a record made which presents no error warranting a reversal.

The judgment and order appealed from are affirmed.

CHRISTIANSON, Ch. J., concurs.

GRACE, J. I concur in the result.

BRONSON, J. I dissent. This case was argued and submitted before this court on December 23, 1918. It was again reargued before this court on November 17, 1919. The case is now (December 2, 1919), about to go down affirmed under the majority decision. I adhere to my conclusions, stated in an opinion circulated by me in the month of February, 1919. If the plaintiff has been injured to the extent of the verdict rendered, which the majority opinion sustains, and which in my opinion the evidence does not warrant, this action should long

ago have been determined as a matter of simple justice to the plaintiff. I am firmly of the opinion that a new trial should be awarded this case, conditioned upon the payment into court of an amount of money, for the use and benefit of the plaintiff, necessary to cover costs, expenses, and for an opportunity to establish her true physical condition before a jury. My conclusions upon the record herein, are as hereinafter stated:

This is an action for personal injuries, sustained by the plaintiff on February 3, 1915. At the time she was working as a servant or domestic in an old brick veneered building known as the Ely Block, and Annex, owned by the defendant in the city of Fargo. While proceeding down the back stairs to the basement of such building to attend the furnace, a portion of the rear brick wall fell, some of the brick hitting the plaintiff. She was knocked down, and the alleged injuries sustained thereby form the basis of this action.

In the district court trial was had, commencing January 24, 1918, and ending February 1, 1918. The jury rendered a verdict for the plaintiff of $26,000. After judgment was entered, the defendant moved for judgment non obstante, or in the alternative, for a new trial, and from the order of the trial court denying the same, and from the judgment rendered, defendant prosecutes this appeal.

The record herein is extensive and the briefs of the parties voluminous. The defendant has assigned nearly one hundred errors, covering the rulings of the trial court upon the admission of evidence, remarks of the court and of counsel, instructions of the court, and covering other alleged errors of law occurring during the course of the trial, and upon the motions made by the appellant thereafter.

The record has been investigated with considerable care with respect to the many assignments of error that have been specified by the appellant.

In view of the determination of the principal questions considered herein, I deem it unnecessary to consider the numerous assignments of error in detail, except as hereinafter stated concerning the principal question in this case which has seriously engaged our attention. Upon the entire record herein I am satisfied that the jury were warranted in finding the defendant guilty of actionable negligence for such injuries as the plaintiff has actually sustained.

The principal question, therefore, is the amount of the verdict rendered. The appellant challenges the same upon the ground that it is manifest that excessive damages have been given by the jury under the influence of passion or prejudice, and that, upon the whole record herein, the evidence does not justify the same as rendered.

In many respects this is an unusual case. At the time of the injury the plaintiff was twenty-two years of age; until she was sixteen years of age she had worked on a farm with her mother; she had reached the eighth grade in school; thereafter she came to Fargo and worked out as a domestic for several years. For nearly a year prior to the accident, she was working for her mother in this block taking care of rooms and of the furnace and receiving therefor $25 per month and her room and board. Theretofore she has been strong and healthy. The defendant on April 3, 1913, leased for eight years the second floor of this Ely Block to one James Papas or James Papamanoles, a Greek. This Greek some years previous had married the sister of the plaintiff. Since the leasing and up to the time of the trial this Papas and his wife had occupied a room in this block. On June 24, 1913, this Papas assigned to his mother-in-law, the mother of the plaintiff, this lease, and thereafter the mother had charge of the premises. There is evidence in the record that this building with reference to the brick wall which fell had been in an unsafe condition for a time extending back long before the making of the lease. That on the day of the accident the plaintiff was found at the bottom of the stairway with brick from this brick wall upon and about her; that she was picked up and carried to a room in this building; that she was unconscious, and bleeding at the mouth and nose; that across her back there appeared a contused bruised area extending from the upper surface of her shoulder blades 5 or 6 inches down the spinal column, and from the right shoulder down on the right arm nearly to the elbow. The skin was broken in places with a slight hemorrhage. There were no broken bones. There she was put to bed, there a doctor was called in and attended her, and there she has ever since remained in bed in this block.

There is evidence in the record that for nearly three years up to the time of the trial the plaintiff has been paralyzed; the doctors, the experts for the plaintiff, diagnose her condition as "traumatic neurosis" or "traumatic paralysis," an affectation of the motor nerves with ac-

companying hysteria, an accompanying exaggeration of the sensory nervous system. She has received the care and attention of her relatives, particularly her sister and her mother. She has been attended by a doctor, an expert witness for the plaintiff, a homeopathic physician, who has attended her, at first daily, then thrice a week, thence twice, and thence once per week, and who has prescribed for her in accordance with the principles of homeopathy. She has been attended by a nurse, an assistant in the Nelson Sanatorium, since March 23, 1915, who came there at first thrice a week, thence twice a week, and later once per week. This nurse administered massage and electric treatments with her hands, an electric vibrator, and the so-termed "lucre-descent" light treatment.

The evidence adduced by the plaintiff shows her condition to be peculiar. Since the time of the accident she has been unable to move any portion of her body, excepting that she has regained a partial use of her left hand and left forearm. During all of this time she has been extremely sensitive; whenever her body is moved, her arms or limbs raised, her neck raised or turned, her feet pricked slightly or touched with a pin she will shriek, cry, or give exclamations of pain; whenever the nurse would start to manipulate or move any part of her body, her arms or her limbs to apply the treatment, she would cry out and give evidence of extreme pain.

Six doctors, as experts, gave testimony; three for the plaintiff and three for the defendant. The plaintiff called the homeopathic physician who attended her; also another homeopathic physician, of twenty-three years' experience, who saw the plaintiff four or five times within two weeks before he testified, and who examined her twice within that time; also another physician, engaged in the practice of medicine and surgery for some eleven years, who examined the plaintiff once in the presence of two homeopathic physicians. The defendant called a physician and surgeon of twenty years' experience as a general practitioner, who examined the plaintiff twice, once in May, 1917, and again during the course of the trial; also another physician, apparently a general practitioner whose qualifications are conceded by the plaintiff, who likewise examined the plaintiff twice, once in May, 1917, and again during the course of the trial; also another physician and surgeon, a general practitioner of forty-one years' experience, who examined the plaintiff during the course of the trial.

Outside of the physical surrounding circumstances evidencing over a considerable period of time the disability of the plaintiff, the question of whether the plaintiff is permanently injured depends entirely upon the expert evidence or the opinion evidence of these doctors. All of the doctors generally agree that the body of the plaintiff is fairly well nourished, her heart, lungs, and other internal organs are practically normal, and that generally speaking there is no lack of functioning except with respect to the motor nervous system and the exaggerated functioning of the sensory nervous system. One of the experts for the plaintiff testified that although there is no apparent injury to the spinal cord, yet he thinks there is a lesion of the spinal cord; another of the experts for the plaintiff gave testimony that the reflexes of the plaintiff are delayed; that when the body of the plaintiff is turned over her arms or limbs fall and place themselves without evidence of muscular control. Another expert for the plaintiff testified that the sympathetic nervous system is healthy, but the motor nervous system is not. Generally the experts for the plaintiff state that there is a paralyzation existing of the motor nerves, and that in their opinion the plaintiff is permanently injured. The general practitioner, the expert for the plaintiff, testified that his examination of the plaintiff disclosed that the body of the plaintiff was fairly well nourished, that the lungs, heart, liver, kidneys, intestines, and female organs were normal. This doctor gave his opinion that the plaintiff was permanently injured; that the condition was what he termed symptom complex, because it involved certain physical changes; that there was here a "traumatic neurosis" due to a spinal injury and the hysterical element, the traumatic element due to the physical and mental suffering resulting from the original injury; that there was an abnormality found in the muscles that control motion, likewise in the muscles that control sensation; that there was an abnormality in the sympathetic nervous system, which does not react in a normal way on the nerve seats. He further testified that the right arm reflex responded immediately to the blow with pain—that is, it was delayed; that the left arm reflex was not so pronounced, with no particular pain; that the knee reflexes were much increased over the normal; that the plantar reflex gave no response. The doctor further admitted, with reference to the hysteria and pain evidenced, that simulation, under the circumstances, was possible.

The experts for the defendant generally agreed that the plaintiff is well fleshed and well nourished; that her skin is of a proper color; that there is no nutrition disturbance; that there is no indication of injury to the spinal cord; that her heart, lungs and other bodily functions are normal. One testified that the reflexes were normal; another testified that the knee reflexes were normal, but the foot or plantar reflex was not. That if there existed in fact a motor paralysis there would be a nutrition disturbance, a disturbance of the bladder; that bed sores would inevitably appear. All of the experts agree that the plaintiff did not have any bed sores. All of the defendant's experts agree that the plaintiff in their opinion can walk; that she can use her right arm; that she is not permanently injured; that she will recover; that the hysteria evidenced is peculiarly subject to auto suggestion and the suggestions arising from her surroundings. One of these experts further testified that if the plaintiff were put in a sanatorium, he would expect a rapid recovery; that she ought to be entirely well in six months.

The plaintiff was brought into court upon a cot. From this cot she gave her testimony, interrupted with frequent outcries of pain and suffering. Frequently she was taken from the court room during the course of her examination, crying and with evident hysteria. The defendant subjected her to a long and severe cross-examination covering forty-nine pages in the transcript. When her arm or any portion of her body, except her left fore arm and hand, were touched or handled in the court room she screamed and gave evidence of great suffering; when her head was raised to give her some water she screamed out with pain. The severe cross-examination, at least, served to exaggerate her condition and her hysteria. The demonstration visualized before the jury cannot be overlooked. This demonstration in open court naturally appealed most forcibly to the tender sympathies of the jury. It might very naturally cause them to be biased and prejudiced in the consideration of the permanency of the plaintiff's injuries, when the extreme physical suffering of the plaintiff in their very presence is actually seen and visualized, as opposed to the impassionate testimony of the experts and other witnesses. The defendant introduced testimony of some witnesses tending to show that the plaintiff was not injured by the fall of the brick wall, for the reason that she was not

there at the time. The defendant also introduced the testimony of some witnesses, among them two detectives, tending to show that the plaintiff at one time was up in her room dusting her mattress and moving about the room; that at another time she was seen in the hall going to the toilet; that at other times she was moving about her room, and at another time she was operating a music box or phonograph when no one else but herself could be there.

The defendant contends that this action is a case of simulation; that the plaintiff was seclusively kept and watched, and no one allowed to see her except her immediate attendants and relatives, who have testified for her favorably in this case.

This matter, however, upon the record is one of fact for the jury, but it nevertheless has its importance in determining the vital question in this case concerning the permanency of the plaintiff's injuries. In this connection it is particularly noticeable that this condition of the plaintiff, termed to be a traumatic neurosis, a motor paralysis, importing a condition of lesion of the spinal cord, as claimed by some of plaintiff's experts, has received the attention of medical science and medical research only to the extent of applying homeopathic principles and doctrines, and of massage and electrical treatments by a nurse.

Cases of this kind are *sui generis;* whether under such state of facts, the injuries are permanent is a matter of speculation, under all medical authorities and in accordance with the researches of medical science. The "simulation" mentioned may be actual, that is pretended, or unconscious, that is real. In cases of this character the hysterical element, the evident pain and suffering, may be partially at least, due to the litigation, to introspection, or auto suggestion, even to suggestion from without. Whether such simulation is evidence of permanent injuries is quite problematical. If there be a traumatic lesion in fact, the condition may and possibly will remain permanent. Whether there is such a traumatic lesion here none of the experts know. The question whether she is permanently injured rests entirely upon the opinion of experts. Even this opinion evidence is not backed up by the application of all the means at hand of medical science and appliances which might serve to determine or conclude the question.

In order to sustain the verdict in this case awarded for this large sum of money, it must fairly appear that there is evidence in the rec-

ord warranting the finding of the jury that the plaintiff was injured permanently in the respect that she testified, and as her apparent condition revealed to the jury at the time of the trial.

Manifestly, if the plaintiff would recover wholly or to a considerable degree, by the application of the best medical science and medical research, within a period of six months, or even two or three years, the verdict is excessive.

There is no evidence in the record to show that the plaintiff has received all the treatment and the best attention that medical science and medical research in this sort of an injury affords. There is evidence in the record, an expert opinion, that if the plaintiff be placed in a sanatorium, and taken from her surroundings, a rapid recovery should occur.

This court cannot speculate concerning the permanency of plaintiff's injuries; neither can the jury. In cases of this kind it is the duty of the court to exercise the utmost circumspection. Johnson v. Great Northern R. Co. 107 Minn. 285, 119 N. W. 1061. The future continued existence of plaintiff's present condition, throughout her lifetime, must be shown with reasonable certainty to authorize damages based upon a finding that her condition is permanent. The permanency of plaintiff's injuries depends upon expert opinion evidence; although given by experts, it nevertheless consists of mere opinions, creditable, more or less, in accordance with the experts' information upon the subject-matter involved. The opinion evidence in this case is in direct conflict concerning the permanency of plaintiff's injuries. This court does not presume to weigh testimony; a conflict of opinion evidence is viewed in a different light; it differs from testimony dealing with facts. In ascertaining whether there is proof to a reasonable degree of certainty establishing the permanency of plaintiff's injuries, it is the right, and even the duty, of this court to consider such opinion evidence at its true and proper value. Waterman v. Minneapolis, St. P. & S. Ste. M. R. Co. 26 N. D. 548, 145 N. W. 19.

Very often such opinion evidence of experts is unreliable not only on account of the method of selecting experts, which serves to induce bias, but also for the reason that, in cases of this character, the expert, although learned and experienced, may not have had direct, or even any, experience, in the consideration thereof. In such cases such opin-

ion evidence may be even rejected as an insufficient basis for the verdict of the jury where the court is satisfied that reasonable certainty is outside of the possibilities of the case upon the record. Spear v. Hiles, 67 Wis. 361, 30 N. W. 511; Johnson v. Great Northern R. Co. 107 Minn. 285, 119 N. W. 1061; Baxter v. Chicago & N. W. R. Co. 104 Wis. 307, 330, 80 N. W. 644, 6 Am. Neg. Rep. 746.

The evidence, at best, shows the condition of the plaintiff to be functional; subjective, not organic. Whether there is a traumatic lesion of the spinal cord is wholly problematical. Upon this subjective condition, with no direct or positive evidence of organic trouble, a condition which under the medical authorities is subject to suggestion, either within or without, a condition from which recoveries are known, the opinion evidence of permanent injury is founded. Osler, Practice of Medicine, 7th ed. 433; Bucher v. Wisconsin C. R. Co. 139 Wis. 597, 120 N. W. 518.

This court must carefully protect the right of the jury to pass upon all true questions of fact submitted to it. This court must likewise guard against any miscarriage of justice. More and more litigants, seeking justice, must submit and be required to submit all probative facts which will enable courts of justice to render and administer impartial justice. This cannot be secured when based on speculation and conjecture. Both the jury and the court are entitled to have submitted to them all evidence within the reach of the parties or the court that will tend to remove questions of doubt and uncertainty.

With great reluctance this court deems it necessary to disturb the verdict rendered herein. The plaintiff has been seriously injured; she has suffered greatly, but it is altogether uncertain whether her injuries are permanent. The manner in which the plaintiff was cared for, the place where she was kept, the unusual physiological condition of her body, the amount of the claim that she made against the city within about thirty days from the time of the accident, the opportunities for simulation in a case of this character, the visual demonstration made before the jury, are all strong corroborative circumstances which serve to throw doubt and uncertainty upon the expert opinion evidence of the plaintiff upon which solely the amount of the verdict rendered herein can be sustained. Although there is evidence which shows that for three years the plaintiff has remained in this condition, yet during that

time she has received the application of medical science only through principles of homeopathy and massage. It is not in evidence that this is the only exclusive treatment which will accomplish a recovery in this case or cases of this character. It simply serves to render more speculative the opinion evidence of the plaintiff.

The interests of substantial justice require that the jurisdiction of this court and of the trial court be exercised to the end that it may be ascertained as far as medical science and the surrounding circumstances will permit, the extent and permanency of plaintiff's injuries. If the courts do not possess this power, the power to ascertain the facts as certainly as possible, and to call in science for that purpose, with the consent of the parties, then the courts must confess the right to speculate and conjecture upon facts, based upon conjecture and speculation, which otherwise might be made more definite and certain.

The courts in this state possess an equitable discretionary power in the granting of new trials; this power may extend to the imposition of reasonable terms upon the moving party when justice so requires.

Under our statute (Comp. Laws 1913, § 7844) this court has the undoubted authority to reverse or modify the judgment or order herein. Ordinarily the granting of a new trial upon grounds of the insufficiency of the evidence to justify the verdict is within the discretion of the court. This discretion may properly be exercised by granting a new trial only upon equitable terms. The appellant seeking redress against an improper verdict, and not herself wholly free from fault in the record that produced such verdict, must subject herself to the equitable power of this court. This principle is familiarly applied in the imposition of costs or of the entire costs of a previous trial, upon the appellant, conditioned upon the right to a new trial. Swallow v. First State Bank, 35 N. D. 323, 328, 160 N. W. 137; Corbett v. Great Northern R. Co. 28 N. D. 136, 150, 148 N. W. 4; Rice v. Gashirie, 13 Cal. 53; Wolfe v. Ridley, 17 Idaho, 173, 104 Pac. 1014. See note in 20 Ann. Cas. 39; Godfrey v. Godfrey, 127 Wis. 47, 106 N. W. 814, 7 Ann. Cas. 176; 1 Hayne, New Tr. & App. p. 865, vol. 2, p. 1694; Baylies, New Trial, p. 546; Elliott, App. Proc. § 570.

Thus in the case of Brooks v. San Francisco & N. P. R. Co. 110 Cal. 173, 42 Pac. 570, where plaintiff recovered a verdict for $5,000 for personal injuries, and upon motion for new trial the trial court granted

the same, conditioned upon the payment of $300 attorneys' fees and expenses incurred in the motion, the court upheld the principle that a new trial may be awarded where the evidence is insufficient to support the verdict, conditioned upon compliance with equitable terms imposed.

In this state it is true that this court has held that a new trial must be granted absolutely, and there is no power to authorize a remittitur of a portion of the damages awarded, where the same are excessive through the influence of bias or prejudice upon the jury, construing § 7660, Comp. Laws 1913, subd. 5.

Carpenter v. Dickey, 26 N. D. 176, 143 N. W. 964; Waterman v. Minneapolis, St. P. & S. Ste. M. R. Co. 26 N. D. 540, 145 N. W. 19.

However, in the latter case, supra, the court said: "In cases of excessive damages not given under the influence of passion and prejudice, it may be that the trial court possesses the inherent power, regardless of the statute, to grant a conditional order for a new trial in the event that the plaintiff will not voluntarily remit a designated portion from the recovery."

These cases, however, are clearly distinguishable from the situation existing in the instant case. In those cases the principle involved is the finding of the court of an existing bias or prejudice that created the excessive verdict. There is an evident reason in such cases why the court should not substitute its judgment for that which would have been the judgment of the jury if they had acted without prejudice and bias.

In this case the principle involved is the right of the trial court, and of this court acting within its appellate jurisdiction, to exercise its equitable discretion in granting a new trial as a matter of favor, where it appears that the judgment as rendered is not justified by the evidence as to the amount thereof.

Where a verdict or finding of the court is excessive upon the evidence, this court does have the power to authorize a remittitur of the excess. Aronson v. Oppegard, 16 N. D. 595, 114 N. W. 377; Ross v. Robertson, 12 N. D. 27, 94 N. W. 765; Lohr v. Honsinger, 20 N. D. 500, 128 N. W. 1035; Galvin v. Tibbs, 17 N. D. 600, 119 N. W. 39.

Among the numerous assignments of error stated by the appellant it is complained that the trial court erred in sustaining the objection of the plaintiff to the following question propounded by defendant to Dr.

Vidal: Q. Has it been your experience, Doctor, in many of these cases that if there was a verdict for the plaintiff the party recovered and would walk?

The plaintiff asserts that Dr. Vidal did not testify as an expert, but as the attendant physician who knew plaintiff's condition. He did, however, give opinion evidence. In view of the order of this court, it is deemed proper to pass upon this assignment: It has happened in cases of similar alleged and proven condition that recovery follows a settlement or disposition of an action maintained therefor. Osler, Practice of Medicine, 7th ed. 433; Robinson v. Spokane Traction Co. 47 Wash. 303, 91 Pac. 473. The plaintiff asserts that this was an attempt to insert a collateral issue. The question does not disclose any such intention. It was wholly proper to fully cross-examine the doctor upon the opinion that he had given concerning the permanency or extent of plaintiff's injuries. This opinion was necessarily based upon the experience, observation, and learning of the doctor. If his experience and learning disclosed that in cases of traumatic neurosis or paralysis a rapid recovery was had when the lawsuit therefor was settled or determined, such fact was of direct and probative value in determining the weight to be accorded to his opinion upon the instant case. The trial court therefore erred in sustaining such objection.

This, though, by itself, not deemed prejudicial error, simply discloses another corroborative circumstance that heightens the uncertainty of plaintiff's permanent injuries. We are satisfied from the record that the jury was warranted in finding that the defendant was liable for the injuries sustained by the plaintiff and that the plaintiff was injured. I am satisfied from the entire testimony herein that it is not reasonably certain that plaintiff's apparent disabilities are permanent. I deem it unnecessary to determine that the damages awarded are excessive through the influence of passion or prejudice of the jury, although there are strong circumstances tending to so indicate. I am of the opinion that the evidence herein upon the whole record is insufficient to justify the amount of the verdict rendered for the reason that the permanency of plaintiff's injuries is not proven to be reasonably certain. I am also of the opinion that the court possesses the inherent power, when occasion requires in the interest of substantial and impartial justice, to grant a conditional order for a new trial based upon the

good faith of the litigants in earnestly endeavoring to assist the court in determining the extent of plaintiff's permanent injuries.

The defendant, found by the jury legally liable for plaintiff's injuries, and complaining of the verdict rendered, must show a willingness to assist the court in this matter. The plaintiff seeking only impartial justice and reparation in money for her damages sustained. should likewise exhibit a willingness to assist.

ROBINSON, J. The plaintiff is known to the court as The Sleeping Beauty. She is an ideal of physical perfection, and yet she claims that for three years she has been reposing continuously on her bed. Her mother is the holder of a rooming house tenement on Broadway, in the city of Fargo. She holds it as the assignee of a lease made by the defendant to Papamanoles. The lease was made in April, 1913. Two months afterwards it was assigned to the mother. Then, towards the last days of February, 1915, and nearly two years afterwards, during a violent storm, the plaintiff had the misfortune and imprudence to go down the back stairway when some of the brick veneering fell on her shoulders, to her great injury. Her claim is that she has been permanently injured and paralyzed so that she will be always confined to her bed.

It appears beyond dispute the falling brick contused the flesh on her shoulders, but did not cut or break the skin or in any way mar her personal appearance. At the trial her body showed no signs of bed sores, though she claimed to have been continuously in bed for three years. The doctors examined her head, eyes, mouth, tongue, teeth and found everything normal. She is a well-built young woman; her arms, legs and body are normal and well nourished; her digestion is good; her weight is normal; her muscles are natural and not shrunken. From the crown of her head to the soles of her feet she has not on her body a scar, a blemish, or a defect. Hence we call her The Sleeping Beauty.

The appeal is from a verdict and judgment for $26,000. The trial was conducted in a manner decidedly improper. As in a theatrical play, the plaintiff was brought into court on a cot and by her tears, screams, and appealing looks, she impressed the jurors—won their pity and commiseration. Then, it appears that counsel in his zeal for defendant forgot all prudence, and cross-examined the plaintiff and gave her an excuse for tears, and angered the jury. And the plaintiff

was shrewd and perceptive; she knew when to weep, when to scream,. when to remember, and when to forget. The appeal was to the pity and commiseration of the jury, rather than to their deliberate judg-- ment. If the plaintiff was in a helpless condition her testimony should have been taken by deposition and the court should not have permitted any theatrical play. The verdict must be largely for future damages. and to give the jury some basis for guessing at such damages proof was given that plaintiff was only twenty-two years old; that she had a fair prospect of forty years in bed, with the expense of attending physicians and nursing, and the loss of her earning capacity. Her three physicians testified· that in their opinion her injury was perma- nent. Three other physicians testified that in their opinion she was. merely shamming and that she could walk if she wanted to. To give weight to this testimony, it was shown that plaintiff had been kept in seclusion in the building in which she was injured and she had been kept from general observation, and not in a hospital or sanitarium. Of course such treatment and such seclusion lend color to the charge that she was acting a part and to a great extent shamming. Hence defend- ant offers to pay such sum of money as may be necessary to give the plaintiff the best of care and medical treatment and attendance at the best sanitariums and hospitals, and to pay her, or to the clerk for her use, such sum as the court may think just and reasonable, or about $700 a month for six months. But to that offer counsel for plaintiff do. strenuously object. By right or wrong, they have obtained a verdict and by *fas* or *nefas* they purpose to hold onto it. In argument counsel have shown that in cases like this such verdicts are often obtained by fraud and imposition on courts and jurors, and that after payment of the judgment the plaintiff quickly recovers from the alleged personal injury. In this case if the plaintiff recover $13,000, and her counsel $13,000, I think that within a year the Sleeping Beauty would be per- fectly cured and the judges would have reason to feel like dolts. Cer- tainly the verdict is so grossly excessive as to show that the jurors were affected by the theatrical acting and by the tears of The Sleeping Beauty.

And so far as the verdict relates to future damages, it is a mere guess, contrary to the express words of the statute. The statute is that in the trial of such a suit "damages must be awarded for such injuries

as have resulted or are certain to result." Comp. Laws, § 7141. Now the plain words *"certain to result"* do not mean anything less than *certain to result*. In the York Case, 41 N. D. 137, 171 N. W. 312, the court instructed the jury thus: "In passing on the damages you may consider the injury plaintiff received or the likelihood of such injury being permanent." We held the instruction to be directly contrary to the statute which limits damages to those *certain to result* in the future. But here it is contended that in the statute the word *"certain"* is not used in the absolute sense; that it means only such damages as are *reasonably certain* to accrue in the future; that in a case such as this recovery of prospective damages would be precluded if the statute required more than reasonable certainty. Now, that may be good argument to address to the legislature on a bill to change the statute; but it is no reason for the court to modify the statute by inserting the adverb "reasonably" before the word "certain." We should rather presume that in such cases as this, where there is no visible injury to the body and no impairment of bodily functions, a verdict for prospective damages must be a mere guess or conjecture. It cannot be proven with either certainty or reasonable certainty, but it can be proven that in such cases the best cure for the injury is the payment of a big verdict. Such cures do certainly occur and show good reason for the statute that in such a case the damage must be certain to result. Of course in ordinary cases we are well disposed to show a proper regard for verdicts found on proof of actual facts, and not on conflicting opinions. But in a case in which a $26,000 verdict is the result of a mere guess, on a trial conducted in disregard of legal ethics and for a big contingent fee, the duty of an appellate court is to weigh the evidence and to consider the case on its merits. We know that in such cases doctors are brought from a distance and paid liberally for an opinion, and in some cases they may have a contingent interest in the verdict just the same as the attorneys. The leading doctor who testified for the plaintiff has a large bill of charges, with no hope of recovery, unless upon the verdict. The doctor was brought from Jamestown, and the court refused to allow an examination concerning the amount of his fees. The plaintiff was asked concerning the contingent fee of her attorneys and she remembered nothing of it. The opinion testimony of the doctors amounted to nothing. They were entirely safe in testifying as they pleased.

## The Impeachment.

An attempt was made to impeach the plaintiff and her witnesses by showing that she and her whole family had just come from testifying in a bankruptcy case of Papamanoles. The testimony given in that case was in effect that at the expense of creditors Papamanoles had just constructed a large Riverside flat, worth some $25,000 or more; that he had conveyed the same to the mother and gone into bankruptcy. That in a creditors' suit to avoid the conveyance the plaintiff and her family had testified that they had earned the money, gave it to the mother to pay for the flats; that the mother had kept the money in a tin box until she gave it to Papamanoles. The offer was to show that in another big fortune suit the Larson family had all come from swearing to a story incredible and preposterous.

Now it is true that the rules of evidence do change with the changing conditions of society, and when the reason of a rule changes, so should the rule itself. In former times people lived in conditions far different from those which now prevail. They grew up, lived, and died in the same neighborhood. They had more fear of false swearing, more fear of God and the devil. They had no big fortune suits. Hence the method of impeaching a witness was to show his character for truth and veracity in the neighborhood where he lived. Now that method is impossible in new countries where people go about from place to place like Gypsies and do not live in any neighborhood so as to form a character; and now it has come to the point that with many people an oath has no binding force. Hence, I think that in this big fortune case it would have been proper to show the character of the testimony which was given in another big fortune suit. However, under the conceded facts and the law the plaintiff is not entitled to recover anything from the defendant. For negligence and want of care she may be entitled to recover from her mother. Comp. Laws, § 6108. At the time of the accident the mother held the tenement under a lease by which she was bound to keep it in repair. The plaintiff was in the employ of her mother or in the house as the daughter of her mother, and, unless as the servant or the daughter of her mother, she had no right to go upon the back stairway and to be in the backyard when the bricks fell. In going down the stairs the plaintiff was a mere trespasser, unless she was there under the lease to her mother. She stood

in the shoes of her mother and in the shoes of Papamanoles. Keegan v. G. Heileman Brewing Co. 129 Minn. 496, L.R.A.1916F, 1149, 152 N. W. 878. Defendant was under no contractual or legal obligation to guard the plaintiff and to keep the bricks from falling onto her, or to restrain her from going down the stairway at the time of a violent storm.

The complaint avers that for years prior to the accident defendant owned the tenement and that she negligently and carelessly permitted the same to become and to remain dilapidated and the walls and the brick thereof to get out of plumb and in such condition as to create a common nuisance, and that so it remained for many years, and that plaintiff had no warning and she knew nothing of the conditions. Now the latter clause is obviously untrue. Papamanoles, the contractor and builder, the mother, and the whole Larson family had been in the tenement with full sense to observe its condition for a year and ten months. If they shut their eyes and did not observe the conditions of the building, that was their fault. The plaintiff can have no action for negligence, because it depends on some contractual relation; she can have no action for keeping a nuisance in the backyard, as her mother and employer knew of the nuisance, or was bound to abate it and to keep the building in repair. Hence, when the bricks fell she stood in the shoes of her mother.

The condition of the brick veneering was not a nuisance to any person who did not have a legal occasion to go where he might be injured.

## The Veneering.

In regard to the veneering, it was not unsafe when the building was rented. From April 3, 1913, until February 3, 1915, one year and ten months, the veneering withstood all the wintry storms and blasts. Then its fall was occasioned by an unusual and violent storm which blew down an adjacent, new, and expensive Ford Motor Vehicle Building. Hence it appears that at the time of the renting, the condition of the veneering did not render the building unfit for occupancy, and the court must know that at any time it was an easy matter to give proper lateral support to the veneering. It might have been done at an expense of $5 or less by stretching and fastening some woven wire on the outside of the veneering. Now, at the time of the making of the

lease it was well known that the tenement was an old dilapidated building; that was known to every person and it was obvious at a glance. The tenant agreed to take the building as it was and to pay only $55 a month till it should be put in repair, and then to pay $100 a month. He agreed "to keep the premises in good condition and in accordance with the existing laws and regulations and ordinances of the city of Fargo." And it was expressly agreed that should any repairs be required on the roof, by reason of leakage or any other cause, then the lessor was to promptly repair the same. It was agreed that the lessor should furnish to the tenant materials for all necessary repairs and that he might order such material and have it charged to her account. The tenant agreed to pay for all the labor necessary to do the carpenter work, building paper, etc. The lessee, Papamanoles, was a contractor and builder. He rented the tenement for eight years, and contracted to do the work of repairing. The contract was for the lessors to furnish the materials and to permit the lessee to procure the same at the expense of the lessor, and until this was done the lessee was to pay only $55 a month, and then to pay $100 a month. Those terms of payment fairly indicate that the repairs were to be quite extensive as well as expensive. Under such a lease, if the tenant continued to occupy a dilapidated building for one year and ten months, it was his own fault. While the lessor expressly agreed to repair the roof, the lease contains not a word concerning the repair of the veneering, yet the lease does expressly show that the tenant was to do the repairs, and all the repairs, except on the roof, and the lessor was to furnish the material or to have the same charged to her. Under that agreement the tenant continued to hold possession at the time of the trial three years after the accident, and the plaintiff continued to live in the same tenement. Hence the conclusion is that the tenant agreed to do all the repairs, except on the roof. He "agreed to keep the premises in good condition and in accordance with the existing laws and regulations and ordinances of the city of Fargo." The tenant's failure to make repairs according to the contract, the violent wind storm, and the imprudence of plaintiff in going down the stairway during the storm, that was the proximate cause of the accident.

As I think, the law of the case is well settled by numerous authorities holding that in such a case the landlord is not liable for such an

accident. Keegan v. G. Heileman Brewing Co. 129 Minn. 496, L.R.A. 1916F, 1149, 152 N. W. 878.

"When . . . there is no fraud or concealment as to the safe condition of the premises, and the situation is not such as to create a nuisance, the lessee takes the risk of the safe occupancy." Ibid.

"The owner of a hotel is not liable to a guest for the fall of an awning known to be unsafe, unless he is bound by the lease to keep the same in repair." Fellows v. Gilhuber, 82 Wis. 639, 17 L.R.A. 577, 52 N. W. 307; Moroney v. Hellings, 110 Cal. 219, 42 Pac. 560.

As I think, the law of the case is well settled in the case of Bailey v. Kelly, 93 Kan. 731, L.R.A.1916D, 1220, 145 Pac. 556.

"When the condition of property is such that it does not impair the public safety the landlord owes no duty to the public or to any member of the public to change the condition. When he comes to deal with a specific individual as a prospective tenant, he owes that individual no duty except not to entrap him by concealing facts which ordinary inspection would not reveal, and he owes no other individual any duty at all. The landlord may in perfect good conscience offer his property, such as it is, to a tenant, who takes it, such as it is, on satisfactory terms, just as the landlord and tenant did in this case. This is true although buildings may be in tumble-down condition, excavations may be unguarded, or the premises may be otherwise uninhabitable or in unsafe condition for use. The only exception is that of property devoted to public use, such as wharves, railroads, elevators, public halls, and the like. Negotiations having been fairly concluded and possession having been given to the tenant, no obligation on the part of the landlord to safeguard or to repair remains unfulfilled. After that, no obligation to repair arises during the tenancy unless the landlord has contracted to do so. This is true even although the tenant create a nuisance on the premises, dangerous to the public."

The judgment should be reversed and the case dismissed; if not, a new trial should be granted, either absolutely, or on conditions that for six months the defendant shall pay to the plaintiff $700 a month for her own use so that she may obtain good medical treatment and nursing in hospitals and sanitariums of repute, prior to a new trial.

## On Rehearing.

GRACE, J. This case has been presented to this court, by the parties

45 N. D.—5.

filing very extended and comprehensive briefs. It was argued orally before it, on December 23, 1918. Thereafter it was thoroughly and long considered, after which, and before a decision was reached by the court, it was ordered reargued, and such reargument was had on November 17, 1919.

Thereafter, a decision was reached, and by a divided court.

Justice Birdzell wrote the majority opinion, which was signed by Chief Justice Christianson and the writer hereof; Justices Bronson and Robinson dissented, in separately prepared dissenting opinions. The majority opinion set forth quite fully the facts of the case, as did the dissenting opinion of Justice Bronson. It will not be necessary to restate those facts.

The majority opinion analyzes and decides most of the controverted points of law presented rightly, with the exception of certain ones hereinafter to be noted, and which must be decided in reverse to their decision, thus necessitating a modification of it, and the reversal of the judgment, which, by it, was affirmed.

In that opinion it was held that it was not reversible error for the trial court to deny defendant the right to impeach the plaintiff, her mother, her sister, and her brother, by refusing defendant's counsel the right and privilege, upon cross-examination of plaintiff's brother, to show that they gave certain testimony in the Federal court, in a proceeding in voluntary bankruptcy, filed by one Papamanoles, and certain testimony, by the same parties, in an action maintained by the trustee, to set aside certain conveyances and mortgages, given by the bankrupt to the mother of plaintiff, all of which testimony was entitled to so little credence, that it was found to be false by the Federal judge who tried the case, who found as a fact that those parties committed perjury in giving such testimony.

The defendant having been refused the right to impeach the above-named witnesses, made the following offer of proof:

"The plaintiff having been sworn in this case, and Mrs. Papamanoles and the brother, Albert Larson, the defendant now offers to prove, on cross-examination, for the purpose of impeaching the testimony of these witnesses, and as affecting their credibility, that in 1915 and 1916, Papamanoles filed a petition in bankruptcy, in the United States district court, for the district of North Dakota, S. E. Division; that

said petition was a volunteer petition; that prior thereto, he had conveyed all of his property, of every kind and description, to his mother-in-law, and the grantee in the deed and the mortgagee in the mortgage was Emma Larson, his mother-in-law; that these conveyances were made with intent and purpose of defrauding his creditors; that he then entered into a conspiracy with the witness Albert, that was on the stand, and his sister, the plaintiff in this case, and with his wife, to commit the crime of perjury; that these people named, testified in the United States district court, in substance, that the mother-in-law, the grantee and mortgagee in the instrument, had a large sum of money, that was transmitted to her, by her daughters and by her sons, amounting to several thousand dollars, which she kept in a box, hidden in the cellar of her residence, in Minnesota; that this money was sent to her, by her sons, including the witness on the stand, who was in the employ of various railroads and lumber companies, in the form of bills and currency; that this money was never put in any bank, but was delivered to Papamanoles, in the construction of the Riverside Flats; that this evidence was given, not only in the bankruptcy court, but in the United States district court, in an action brought by the Dakota Trust Company, as trustee of the estate of James Papamanoles, against E. L. Watt, L. Maude Hyehmar, Albert Larson, and the Red River Valley Mortgage Company; that a trial was had of those issues and that the plaintiff in this case, her mother and her sister, all of them testified that these moneys were paid in the manner mentioned and described; and that they were represented by the Honorable George A. Bangs, of Grand Forks, and the trustee was represented by Watson, Young and Commy, and that Judge Amidon *found, as a fact, in that case, that these parties committed perjury in fact,* and set aside by a decree, that was made on or about the 5th day of July—between the 5th and 8th day of July, 1917; that Papamanoles, Emma Larson, and the parties mentioned, had conveyed the property known as the Riverside Flats, with the intent and purpose of defrauding their creditors out of their just debts and liabilities, and set aside and canceled the deed and mortgage.

"The defendant offers this proof for two purposes. For the purpose of showing that shortly after the decree was handed down, and within a short time, preparations were made to bring this case, which was

brought on the 27th day of January, 1917, within a few days before it outlawed, and that prior to that time, the plaintiff in this action, as well as her relatives, had endeavored to consult lawyers in the city of Fargo, and that they had advised her she had no case, and that this case was brought because, and for the reason, *that the whole family had lost all their property and interests,* and that the evidence is admissible for the purpose of affecting the general credibility of the plaintiff, her sister, her brother, and the whole family; and the same offer is made, with reference to each witness specifically that has testified in this case."

The plaintiff, to the offer, interposed the following objection: "The offer is objected to as incompetent, irrelevant, and immaterial; not admissible as cross-examination of the witnesses, and as not being admissible under the pleadings, no foundation having been laid for the testimony, and for the further reason that the same calls for collateral issues, wholly without the record and without the case."

The court denied the offer. It stated, however, that any evidence which would tend in any manner to impeach the testimony of any witness, in reference to the issue, which was on trial, would be admitted.

Prior to the time of making the offer, the defendant, by specific questions directed to the witnesses, upon their cross-examination, or to some of them, whose testimony she was endeavoring to impeach, sought thereby to elicit the facts, or a considerable portion of them, which are set forth in the offer.

In determining whether or not prejudicial error was committed by the trial court, in sustaining the objection to the questions, and in not permitting answers thereto, and in denying the offer of proof, it is proper to assume that the defendant could have proved the facts contained in the offer, and that the facts inquired about in such questions, if allowed to have been answered, would likely have been established thereby.

It is not necessary to set forth the specific questions. They were objected to, and the objection was sustained. Hence no answer to them was permitted, and for this reason the offer was made.

The facts in the bankruptcy case, and in the action in the United States district court, as recited in the offer, or included in the impeaching questions, have no relation to this case, other than the right claimed

to show those facts, for the sole purpose of impeachment of the wit
nesses above mentioned.

To determine their admissibility for this purpose, it is proper to
to visualize the cardinal elements of the bankruptcy suit, and the suit
in the United States district court, as set forth in the offer.

Concisely stated, they are as follows:

Filing a voluntary petition in bankruptcy by Papamanoles. Prior
thereto a transfer of all his property to his mother-in-law, by deed and
by mortgage; then a conspiracy with his wife, Albert Larson, and his
sister, the plaintiff, to commit the crime of perjury, to show by their
testimony that the mother-in-law had a large sum of money, amount-
ing to several thousand dollars, sent to her by her sons, including
Albert Larson, who were employed by railroads and lumber companies;
that she never put the money in the bank, but kept it in a tin box, and
delivered it to Papamanoles, to be used in the construction of the Riv-
erside Flats. That the plaintiff, the mother and sister, and all, testi-
fied the money was paid in the manner mentioned and described.

If Judge Amidon found the parties committed perjury in fact, and
if he further held that Papamanoles and Emma Larson, and the par-
ties mentioned, had conveyed the property known as Riverside Flats
for the purpose of defrauding the creditors; and if these parties had
conspired together in those cases, to commit perjury, in order to defeat
the claims of the creditors; and if they were confederating and acting
together in this fraudulent manner, to gain a large sum of money,
amounting to several thousand dollars; and if the entire transaction
was one of fraud and conspiracy, supported by perjury, would it not
be proper to permit those facts, if they existed, to be shown in another
and different action, in which the same parties were acting together,
one of them as plaintiff, and the remainder, as witnesses for her, where
it was sought to recover from this defendant, the sum of $35,000 as
damages for alleged personal injury to plaintiff, alleged to have been
caused by defendant's negligence, where the latter suit was brought
shortly after the same parties were thwarted in the actions in the Unit-
ed States court, and where this action was brought just before the Stat-
ute of Limitation became effective as a bar to it, and where the sole
purpose of showing all such facts is for the purpose of impeaching
them, as witnesses, and this, upon their cross-examination.

We are of the opinion not only that it was proper to permit such proof in that manner, but reversible error to exclude it.

There are many ways in which the credibility of a witness may be affected. Credibility is almost as broad as character, which is composed of many moral elements; as, for instance, integrity, veracity, chastity, etc.

The offer of proof does not attack alone the veracity of the witnesses, but as well their integrity in financial transactions.

Papamanoles, his mother-in-law, and these witnesses, who were sought to be impeached, if they conspired to defraud the creditors of Papamanoles, as appears from the proceedings in the United States court, as shown by the offer, were acting in a dishonest manner in the transactions, which were subjected to the scrutiny of the United States court, and that court, according to the offer of proof, set aside the dishonest transfers of property therein involved, as in fraud of creditors.

It would seem that, where the same parties are witnesses in this case, in support of plaintiff's claim, and, upon their cross-examination, for the purpose of impeaching them, or any of them, and for the purpose of affecting the weight to be given their testimony, by the jury, it would be proper to receive such evidence as tending to show their dishonesty, in the bankruptcy proceedings, etc. For, if they acted dishonestly in those matters, the jury might not give so much weight to their testimony in this case, where another large sum of money is involved, and it might analyze and weigh their testimony, with much more care, than it would were their honesty in no manner attacked; and, upon this theory, we think it was prejudicial error for the court to deny the offer.

We think the testimony included in the offer should have been admitted for the further purpose of affecting the credibility of the witnesses, as showing they had an interest in this case. If they conspired to defraud the creditors of Papamanoles, the inference is that they were to get some benefit by doing so.

If they would conspire to commit perjury and act in a dishonest manner in that case, it might follow that they would pursue the same tactics in this, for the purpose of gaining a profit, in event this case resulted favorably to the plaintiff.

As affecting their credibility in this particular case, their conspir-

acy and dishonesty, if any, to defraud their creditors in the other cases, of a large amount of money, would, we think, have a direct bearing on their credibility, and as going to the determination of whether they had any interest in the particular case.

This principle is well illustrated, and clearly discussed in the case of State v. Malmberg, 14 N. D. 526, 105 N. W. 614.

If Judge Amidon found that the witnesses committed perjury in fact, in giving their evidence, it is not to be assumed that such conclusion would affect the credibility of the witnesses to the same degree as if they had been convicted of the crime of perjury, but neither does it follow that it is not in some degree impaired. Were they so convicted, it would necessarily follow that their general credibility for truth and veracity would be greatly impaired. However, in that event, it would remain for the jury to say what weight should be attached to their testimony, or whether it would disregard it entirely; or it might take it into consideration, in connection with other testimony corroborating or tending to corroborate it.

If they testified falsely in the United States court, and if Judge Amidon so found, though all such matter is collateral to the issues in this case, it was proper to prove it, as a circumstance affecting the credibility, in testing the truth and veracity of such witnesses in this case. It does not follow from this, that where one witness testifies positively to the existence of a state of facts, and another testifies directly contrary thereto, that one or the other is guilty of perjury. That is not the condition with which we are dealing.

If in the United States court it was found as a fact that these witnesses perjured themselves, and if the court set aside the deed and mortgage by reason of the fraud and perjury existing in those cases, that presents a different condition than a mere direct conflict of testimony in regard to a material fact. It amounts to something more than that.

As it appears to us it would be a circumstance permissible to be shown upon cross-examination for the purpose of testing the credibility of the witnesses.

It is the general rule that where it is sought to impeach a witness by endeavoring to show his lack of credibility in regard to truth and veracity or honesty, that the inquiry must relate to his general reputation for truth, veracity, or honesty, or whichever is in question, in the community in which he resides.

To the general rule there perhaps are some exceptions; for instance, if his credibility were being attacked on the ground of his disregard for truth and veracity, and it should appear that he had stated to a certain person that for $50 he would testify falsely in any case, it would seem the person to whom such disclosure was made should be permitted to testify to such fact for the purpose of impeachment of such witness.

It would seem this would be a circumstance which would be some proof of his disregard for truth and veracity, though it is an independent circumstance which, perhaps, is not included in the facts which go to make up his general reputation for truth and veracity. And so it would seem, on this principle, that if it were a fact, that the witnesses in question testified falsely in the cases in the United States court, and if that were found as a fact by the trial court who presided at the trial of those cases, that such would be a circumstance which might be shown upon the cross-examination of those witnesses for the purpose of impeaching them, and in this regard is competent evidence for testing their credibility for truth and veracity.

We think it is clear from what has been said that the exclusion of the testimony sought to be introduced for the purpose of impeachment, and the denial of the offer of proof was prejudicial, reversible error necessitating the granting of a new trial.

We think, on all the reasons stated, the judgment appealed from should be reversed, and the case remanded for a new trial.

It is so ordered.

The appellant is entitled to her statutory costs and disbursements on appeal. The costs of the trial court to abide the result of the new trial.


ROBINSON, J., concurs.


BRONSON, J. After rehearing, I concur in the opinion of Justice Grace, which finds that the trial court prejudicially erred in refusing to admit testimony proferred by the defendant upon cross-examination. I concur in the reversal of the judgment, and in the unconditional granting of a new trial as stated by Justice Grace.

## On Motion to Reconsider.

ROBINSON, J.

"Open your mouth and shut your eyes
And I will give you something to make you wise."

Such is the plea of plaintiff's counsel. By a great theatrical play and by very questionable means, they have obtained a personal injury judgment for $26,000. On this they have filed a lien for $11,000, and now on the motion for a new trial they beg the judges to shut their eyes to the light of truth, the facts in the case, the manner of conducting the trial, the way the plaintiff has been kept in seclusion, under lock and key, by her elder sister and Papamanoles, who were living together without being married. They wish the judges to shut their eyes to the way in which Papamanoles, the head of the Larson family, attempted to get rich at the expense of his creditors, his building the Riverside Flats, mortgaging the same to his mother-in-law for $15,000, conveying the same to her for $20,000, going into bankruptcy, taking with him into the Federal court the whole Larson family to swear that they had loaned him the money to build the flats. The judges are requested to shut their eyes to the way in which the suit was first commenced against the city of Fargo to recover for the injury, $10,000, with no claim that the plaintiff had been paralyzed.

By Justice Robinson an order was duly made, and by the clerk a copy of the same was mailed to counsel for each party. It recites that on the motion for a new trial the judges of the supreme court are about equally divided; that the case is shrouded in doubt and mystery, and it invites counsel on each side to submit and file with the clerk further proof, by affidavits, depositions and proper documents, bearing on the merits of the motion.

In Neer v. Live Stock Sanitary Bd. 40 N. D. 340, 168 N. W. 610, 18 N. C. C. A. 1, a majority of the judges being in favor of permitting the killing of two good work horses, Justice Robinson made a similar order, directing counsel to submit additional testimony, with a photograph of the horses. Such evidence was received and the good horses were saved—and that put a stop to the needless killing of good sound horses. It is a mere mockery of justice and an insult to the judges to

say that they are bound to shut their eyes to the light of truth and to swallow and confirm a verdict, when they have good reason to believe that it was wrongfully obtained. The new evidence throws a glare of light on the conduct of the case. It shows the plaintiff is still kept in confinement at the home of Papamanoles. For the purpose of ascertaining her present condition, at the request of defendant's counsel, Dr. McGregor went to the door, stated his reasons, and asked to see the plaintiff, but his request was promptly denied by her sister, Mrs. Papamanoles. Why was that? Was it not to keep the court in darkness? If their deeds and their conduct are not evil, why are they afraid of the light?

It is over a year since Justice Robinson wrote and submitted to the judges his first opinion in this case. It is over two years since the trial. Was it not proper that the judges should know the present condition of the plaintiff? What if the proof were positive that she had completely recovered? Would the judges be still bound to open their mouths and shut their eyes and to confirm the verdict?

In addition to the very important newly discovered evidence, showing that plaintiff first sought to recover $10,000 against the city of Fargo, we have now certified documents:—

January 19, 1915. Mortgages by James Papamanoles and his wife, Selma, to Emma Larson, his mother-in-law, consideration, $15,000, on Riverside Flats.

June 8, 1915. Warranty deed by James Papamanoles and wife, Selma, to Emma Larson, mother-in-law, consideration, $20,500.

December 9, 1915. Mortgage, Emma Larson to Helma Larson, Manda Larson, Albert Larson, same property, consideration, $6,420.

April 21, 1911. Marriage license to James Papamanoles and Selma Larson.

February 9, 1916. The marriage of James Papas and Selma Larson, in Polk county, Minnesota.

Thus it appears that prior to February 9, 1916, James Papas and Selma Larson were playing husband and wife without being married. It tends to show they are actors. Selma is the keeper of the plaintiff and her main witness. "James Papas" must have known as much as Selma, and more too, in regard to the Riverside Flats, but they did not dare to put him on the witness stand.

On the trial defendant was denied the right to impeach the plaintiff and all her witnesses by showing how Papas built the flats at the expense of his creditors, went into bankruptcy and in the United States court he and each of the Larson family testified that they gave Papas the money to build the flats, as represented by the big mortgage and the deed. Of course that testimony was highly material, because in one big fortune suit no jury would have believed the witnesses had it been shown that they had just come from testifying falsely in another big fortune suit.

Then it appears that counsel for plaintiff discredit the verdict. If the plaintiff had sustained injury to the amount of $26,000, and if she alone was paralyzed, and not the counsel, then, of course, she should have the great bulk of the money and the counsel should be well satisfied with a fee of $5,000. When they charge $11,000 (a sum that no court should permit) it must mean that they did something extraordinary; that by some shrewd and theatrical practice they recovered a verdict largely in excess of the real injury. And truly on the trial of the case the theatrical play was so wonderful, it does seem the fitting climax was to cast on the screen: Attorneys' fee, $11,000.

The motion for a new trial should be granted.

BIRDZELL, J. (dissenting). I dissent from the opinion of the court on petition for rehearing, but deem it unnecessary to add anything to the views expressed in the principal opinion on the question of evidence upon which the new trial is granted. In adhering to the views previously expressed, however, which, if adhered to by the court, would have led to an affirmance, I deem it proper to say that under all the circumstances appearing in this case an affirmance, in my opinion, might well be with a reservation which would permit the defendant to make another motion for a new trial in the trial court upon the ground of newly discovered evidence. This observation is made in view of the forcible contentions of the defendant that the plaintiff's whole case is a sham; that she has become so adept in the art of simulation as to have deceived both the trial court and the jury; and that defendants are now, and if a new trial is granted will be, amply able to demonstrate the fraudulent character of the claim asserted. Obviously this court cannot consider matters which are not of record and which have not previously been considered by the trial court. It could not pass

originally upon a motion for a new trial. In view of the character of the case, therefore, and of the contentions made, I would deem it proper in the interest of justice to affirm the judgment, and give to the defendant the right to make a further motion for a new trial on the ground of newly discovered evidence. Inasmuch, however, as a majority of the court grant a new trial unconditionally upon the ground of prejudicial error, which, in my opinion, does not exist in the record, I dissent from the disposition made of the case in the manner indicated in the opinion on the petition for rehearing and from the reasons therein stated. I adhere to the views originally expressed.

I am authorized to say that Mr. Chief Justice CHRISTIANSON fully concurs in the views expressed herein.