Art HOLECEK, Plaintiff and Respondent,

v.

Frederick Gust JANKE, Defendant
and Appellant.

Civ. No. 8538.

Supreme Court of North Dakota.

Sept. 23, 1969.

Nilles, Oehlert, Hansen, Selbo & Magill, Fargo, for plaintiff and respondent.

Wattam, Vogel, Vogel & Peterson, Fargo, for defendant and appellant.

TEIGEN, Chief Justice.

The defendant has appealed from an order denying his motion for a new trial. The plaintiff was awarded damages in the amount of $22,000 by a jury for personal injuries sustained in an automobile accident. The defendant does not claim the jury's finding of liability is not supported by the evidence. It is his claim that erroneous reception of evidence and erroneous instructions induced a verdict that is excessive as a matter of law.

The plaintiff, age 51, was seated in his automobile which was parallel parked on Fifth Street in the city of Breckenridge, Minnesota. This street is also known as U. S. Highway No. 75. The defendant's automobile, operated by the defendant, collided with the rear end of the plaintiff's automobile and, as a result, the plaintiff was injured. The collision also caused damage to the plaintiff's automobile but the plaintiff does not seek damages therefor in this action.

The defendant, in his motion for a new trial, has set forth a number of specifications of claimed error, four of which he has abandoned on this appeal. The remaining specifications have been grouped according to subject matter for purposes of argument. Specifications of Error II, IV, VI, VIII, X and XI are grouped claiming prejudicial error occurred in the court's ruling on the evidence and the instructions to the jury with regard to possible future surgery. The plaintiff received flexion extension injury to the back and neck. Dr. Covey, an orthopedic surgeon, testified that in his opinion the plaintiff's injury resulted in a 25 to 30 per cent disability to his spine and neck and 20 per cent disability to his body. He testified the injury was permanent and progressive and that the plaintiff will continue to suffer pain. The defendant argues the court erred in permitting the plaintiff's witness, Dr. Covey, to testify concerning the possibility of future surgery as follows:

"Q  So far as the future is concerned, and based on your profession, what option, if any, is open to Mr. Holecek, so far as receiving some relief from that pain is concerned?

"MR. BRIGHT: I am going to object to that. That's speculative.

"MR. HANSEN: It's the doctor's opinion.

"THE COURT: Overruled.

"THE WITNESS: He can continue to use the heat on his neck and the aspirin for pain. He can use the physical therapy or chiropractic treatments as necessary for his pain.

"There is one other procedure which I thought might be worthwhile, to obtain an opinion about, and that was the possibility of spinal fusion in the area of the osteoarthritis of his neck.

"Q And, Doctor, this other option you have mentioned—in other words, Mr. Holecek can continue treating as he is now. That's one thing open to him.

"A Yes.

"Q And another is spinal fusion?

"A Yes.

"Q Doctor, would you explain how a spinal fusion would give Mr. Holecek any relief.

"MR. BRIGHT: I'm going to object to that. It is speculative and a possibility.

"MR. HANSEN: It's an option.

"MR. BRIGHT: It is a possibility.

"THE COURT: I'll let him testify.

"THE WITNESS: The object of the spinal fusion is to remove motion from the painful joints, and the procedure is to put a bone graft across the arthritic, the painful joints. It would be necessary to—in my opinion—fuse at least three, and possibly four, joints in his neck.

"Q So far as the future is concerned, is this one of the choices that is open to Mr. Holecek, so far as his neck is concerned?

"A Yes.

"Q And, Doctor, when you refer to a fusion, would you step down here to the diagram and indicate to the jury and court what you would do as a orthopedic surgeon? First of all, are you qualified to carry out that type of operation?

"A Yes.

"Q Do you do fusions in your practice every month?

"A Yes.

"Q Explain what this fusion would involve as far as Mr. Holecek is concerned, if he elected to have it carried out.

"MR. BRIGHT: Now just a minute. I would like to ask just a question or two, Doctor.

"Q BY MR. BRIGHT: There are no plans at present for a fusion; is that correct?

"A None that I plan to do.

"Q As a matter of fact, as far as any further thing, you wanted or you suggested that he might go to Mayo for possibly another opinion.

"A Yes.

"MR. BRIGHT: I am going to object to this line of questioning as completely speculative, not within the realm of reasonable medical certainty.

"MR. HANSEN: Now just a moment. I'd like to ask a couple of additional questions.

"Q BY MR. HANSEN: Doctor, have you explained to Mr. Holecek what the options are, so far as the future is concerned, with respect to his neck?

"A Yes.

"Q Have you discussed with him what your opinion is on the matter?

"A Yes, I have.

"Q And have you suggested that he obtain another opinion on the same subject?

"A Yes.

"Q And would you state what you have told Mr. Holecek your opinion is, so far as the future is concerned and this elective process is concerned.

"A Do you mean in regard to the possibilities?

"Q Yes, and what would happen.

"A I told Mr. Holecek that the fusion, if it were to be done, would be a rather extensive procedure. It would involve at least three, and possibly four, joints and, for that reason, I was rather hesitant to perform it myself without some further consultation. If there were just one or two joints involved, the procedure would not be as major a one, or as subject to failure as a fusion over three or four vertebrae.

"Q   So you have left it up to Mr. Holecek as to what he wants to do, whether he will elect surgery or not?

"A   Yes.

"Q   Would you explain, if he elects to have this procedure, what would be done.

"MR. BRIGHT: Same objection—speculative.

"MR. HANSEN: It's an option that this man faces.  If he elects surgery, certainly we are entitled to show what he must undergo.

"MR. BRIGHT: No foundation.

"MR. HANSEN: It's a matter of option.

"THE COURT: Overrule the objection; he may answer.

"Q BY MR. HANSEN: Explain now what this fusion would involve, Doctor.

"A   There are two main ways of doing a fusion.  One is to approach the neck from in front, remove the discs from the vertebrae that are involved, and replace them with a piece of bone so as to make the vertebrae grow together.  The piece of bone is usually obtained from the pelvic bone.

"The other procedure which is done is a posterior fusion which involves bone grafts along the back side of the vertebrae, and you also obtain bone from the pelvic bone.

"Q   In other words, when you say 'pelvic' bone, you would actually remove bone from one of Mr. Holecek's hips and take it and graft it into his neck?

"A   Yes.

"Q   How many areas of the neck would you recommend be covered in this fusion, Doctor?

"MR. BRIGHT: I'd like a continuing objection to this line of testimony.

"THE COURT: You may have.

"MR. HANSEN: You may answer.

"THE WITNESS: I would think at least, certainly three—and possibly four—levels should be fused.

"Q BY MR. HANSEN: If this operation were carried out, could you tell the jury how long Mr. Holecek would be hospitalized?

"MR. BRIGHT: Same objection—speculative, not with reasonable medical certainty, and it is not admissible.

"THE COURT: He may answer.

"THE WITNESS: He would be in the hospital approximately two weeks.

"Q BY MR. HANSEN: And you are pretty certain it would take at least that long, based on experience in cases of this type?

"A   Yes.

"Q   After he has been in the hospital two weeks, would there be any further period of time for recovery?

"MR. BRIGHT: Speculative.

"THE COURT: He may answer.

"THE WITNESS: He'd have to wear a brace on his neck for at least three months.

"Q BY MR. HANSEN: What type of brace would that be, Doctor, could you briefly describe it?

"A   The usual type is what we call a 'four-poster' brace involving a collar around the jaw and around the base of the skull, and another collar fits around the shoulders and between this are metal uprights which hold the neck and keep it from bending and turning.

"Q   He would have to wear that how long?

"A   Three months.

"Q   What would he do at night?

"A   He would wear it at night.

"Q   And so far as the surgical cost of the type of elective procedure that you have just described, how much would the surgical fee be?

"MR. BRIGHT: Speculative, your Honor.

"THE COURT: Overruled.

"THE WITNESS: The surgical fee would be usually around $500.

"Q BY MR. HANSEN: Are you acquainted with hospitalization costs in this general area, Dr. Covey?

"A Yes.

"Q Would you state, in your opinion, what the reasonable cost of the hospitalization period would be for the suggested, that is, the optional surgery you have just described.

"MR. BRIGHT: Speculative, also.

"THE COURT: Overruled.

"THE WITNESS: I would estimate the possible cost for a two-week stay at about $900."

After both parties had rested the defendant moved, in chambers, that the testimony of Dr. Covey with respect to postsurgery be stricken on the ground there was a failure of foundation and proof that such surgery is necessary. The motion was denied.

The defendant then submitted the following requested instruction and specifies it was error for the trial court to deny his motion and to refuse the requested instruction. The requested instruction is as follows:

"You are instructed that to entitle a plaintiff to damages for future medical expenses, such damages, if any, require proof that such future medical expenses are necessary and are reasonably certain to be required in the future. In that connection, you are further instructed that, under the evidence in this case, if the plaintiff is entitled to a verdict, you cannot award him any damages for future medical expense based on any surgical operation of the cervical spine."

He also contends it was error of the trial court to give the following instruction which was excepted to by the defendant:

"A. *Medical Expense*

"1. The reasonable value, not exceeding the actual cost to the Plaintiff, of examinations, attention and care by doctors, services of nurses, attendants and others, transportation, hospital accomodations, x-ray pictures, medicine, therapeutic devices and other supplies, if any, reasonably required and actually provided in treating the Plaintiff, and

"2. The reasonable value of medical, surgical, hospital and other services, care and supplies which you find reasonably certain to be required in the future treatment of the Plaintiff."

Plaintiff argues that the defendant's objections of "speculative" were not proper and were not specific enough and thus the defendant waived any possible objection he might have had to this line of questioning. Plaintiff's brief cites numerous authorities to support the proposition that a party objecting to evidence must point out the objection specifically to the trial court so as to afford the adverse party an opportunity to correct the error. This court agrees with this well-established rule of law, but finds that defendant's objections were of sufficient specificity in this case.

Damages are said to be speculative when the probability that a circumstance will exist as an element for compensation becomes conjectural. Jones v. San Bernardino Real Estate Board, 168 Cal. App.2d 661, 336 P.2d 606 (1959). The purpose of defendant's objections to questions asked of Dr. Covey was to prevent evidence in the record which would allow the jury to assess damages on the basis of mere possibility or conjecture. In cases dealing with future damages courts frequently have to rule on objections phrased "speculative" or "conjectural". See Griffen v. Stevenson, 1 Ariz.App. 311, 402 P.2d 432 (1965); Teegarden v. Dahl, 138 N.W.2d 668 (N.D. 1965); Vaux v. Hamilton, 103 N.W.2d 291 (N.D.1960); Sponable v. Thomas, 139 Kan. 710, 33 P.2d 721 (1934).

■ Plaintiff's contention that there is no speculation involved in regard to the cost of possible future surgery because Dr. Covey is well acquainted with such costs is without merit. Defendant's objections were obviously intended to raise the issue whether the costs for future surgery were reasonably certain to accrue or were a mere possibility. The defendant's objections were related to this issue rather than to the amount of damages. This is borne out by the previous line of objections.

Case law has construed the meaning of the word "certain" as used in Sec. 32–03–03, N.D.C.C., which provides that "Damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof or *certain* to result in the future." [Emphasis added.]

"We are of the opinion that the word 'certain' appearing in the statute is not used in the absolute sense. It relates to the future, and therefore cannot be construed as only embracing those consequences or elements of damages which are absolutely certain to follow a given injury, for future happenings are necessarily somewhat uncertain." Larson v. Russell, 45 N.D. 33, 176 N.W. 998 (1920) at 1002.

This interpretation of the statute was reaffirmed in Leonard v. North Dakota Coop. Wool Marketing Ass'n, 72 N.D. 310, 6 N.W.2d 576 (1942) at 583:

"The effect of this decision [Larson v. Russell] is to construe the statute so as to take some of the certainty out of the word 'certain' as used therein. The salutary effect of this decision is to give the statute a reasonable application rather than one so literal and rigid as to make the proof of future detriment practically impossible."

The court in *Larson* based its interpretation on the fact that the adoption of the statute in the Field Code was to alter the rule then prevalent in England under which damages were allowed only to the time of the commencement of the action.

"The clear purpose of the statute, then, was to alter this rule, and enable a plaintiff to recover damages which are reasonably certain to accrue in the future."

■ Since cases involving possible future surgery are by their nature distinctive from a factual standpoint, each case must be decided on its particular facts. This court has set out the generally accepted rule with regard to admissibility of medical testimony in *Vaux*, at page 293, as follows:

"A medical expert is qualified to express an opinion to a medical certainty, or based on medical probabilities only, but not an opinion on mere possibilities."

In the recent case of Thornburg v. Perleberg, 158 N.W.2d 188 (N.D.1968), we held that permitting a dentist to state that there was a "possibility" that plaintiff might lose more teeth, although error, was not prejudicial because the dentist later testified on cross-examination that, based on medical probability or certainty, it was his opinion the plaintiff would not lose more teeth.

■ These two cases demonstrate that damages based on possibilities will not be allowed. However, these cases were decided on reasoning which is not applicable to the instant case. Dr. Covey testified future surgery was an option available to the plaintiff. Dr. Covey, as an attending physician and as a qualified medical expert, did not base his testimony concerning future surgery on the basis that there was a "possibility" that surgery would be required. The testimony instead is much more analogous to the testimony admitted into evidence in *Teegarden*.

In *Teegarden* the medical expert was asked what he would prescribe if plaintiff's injury would not respond to therapy. The trial court overruled defendant's objection that the question was without foundation and speculative. In response to the question the expert witness said he would recommend a series of more strenuous treatments with a final alternate of surgery. No evidence was introduced as to the costs

of the more strenuous treatments or surgery. This court upheld the lower court's decision allowing this testimony and distinguished *Vaux* on the basis that the question in that case called for opinion in regard to mere possibilities.

"We held the question in the form asked was objectionable because it asked that the opinion be based on mere possibilities. In this case the question calls for a statement of the order in which different treatments are prescribed for a patient suffering from a known malady for which there is more than one type of treatment and which treatments are used in sequence depending upon the results. Treatments had not been commenced. No attempt was made to introduce opinion evidence that the subsequent and more serious types of treatments or surgery were a probability. We find that foundation was established and the testimony was not speculative. The question merely called for a statement of fact as to the course of treatment normal to the circumstances. The fact that the testimony relates to the future does not necessarily render it objectionable as opinion."

■ The fact that neither in *Teegarden* nor in the instant case was an attempt made to establish probability of future surgery indicates that the evidence in both cases was introduced and admitted for more limited purposes than establishing recovery for costs of surgery. The lower court based its admission of Dr. Covey's testimony on the fact that the evidence of future surgery demonstrated that there was no simple or easy way to minimize future pain and suffering which plaintiff's permanent and progressive injury will cause. In line with *Teegarden* it further can be said that Dr. Covey, as an expert witness and as a treating physician, was properly allowed to testify as to plaintiff's available options as this testimony showed the course of treatment normal to the described condition.

■ It is important to note that in *Teegarden* no evidence as to the cost of the surgery was admitted whereas in the instant case Dr. Covey was allowed to testify to estimated hospital costs of $900 and surgical fees of $500. Admission of costs of possible future surgery was prejudicial error. In order for such admission to be proper plaintiff would first have had to establish with reasonable medical certainty or probability that future surgery was necessary, but plaintiff never attempted to establish such probability. The doctor testified there were no plans for surgery at the time of trial and that if surgery is to be performed in the future the decision should be made by the plaintiff and, in that connection, he had recommended to him that he consult with another medical authority before making the decision. He testified the plaintiff could live with the pain and that it was not certain that a fusion would eliminate it, although in about half of the cases a fusion results in eliminating the pain and in about one-fourth of the cases there is improvement; however, in the balance of the cases the patient is the same or worse. Although this court will follow the precedent in *Teegarden* and allow into evidence testimony regarding future surgery for certain limited purposes, it must hold that admission of evidence as to the costs of the surgery in this case was error. When the evidence failed to establish a reasonable medical certainty or probability that future surgery will be required, the admission of the costs of such surgery was without foundation. Weiner v. Wisniewski, 213 A.2d 857 (Del.1965).

■ Defendant's specifications of error in regard to instructions to the jury concerning future surgery are also well taken. The trial court's instruction to the jury allowing expenses for future surgery prejudiced the verdict in this case despite the fact that the instruction was qualified by the phrase "reasonably certain to be required in the future treatment of the Plaintiff." Since the evidence fails to show that

any future surgical expenses were probable, this instruction, coupled with the admission of the costs of the surgery, could not help but prejudice the jury and is, therefore, prejudicial error. Under the evidence and the instruction given with respect to future surgical and hospital services, we must assume the jury included in their general verdict the sum of $1500 for a future fusion. To that extent the verdict is not supported by competent evidence. For this reason we find the verdict is excessive in the amount of $1500. The defendant specified as one of his grounds for new trial that damages awarded appear to have been awarded under the influence of passion or prejudice.

Rule 59(b) (5), N.D.R.Civ.P., authorizes reduction of the verdict in lieu of a new trial in such cases:

> "Excessive damages appearing to have been given under the influence of passion or prejudice, but when a new trial is asked for on this ground and it appears that the passion and prejudice affected only the amount of damages allowed and did not influence the findings of the jury on other issues in the case, the trial court, on hearing the motion, and the supreme court, on appeal, shall have power·to order a reduction of the verdict in lieu of a new trial, or to order that a new trial be had unless the party in whose favor the verdict was given remits the excess of damages; * * *"

■ We do not find nor does the defendant claim this error influenced the jury on the question of liability. In fact, the defendant admits the evidence establishes liability. He has appealed asking a new trial on the ground that the error induced an excessive verdict as a matter of law. For the reasons set forth, the defendant is entitled to a new trial but, in view of Rule 59(b) (5), N.D.R.Civ.P., and our determination that the error was prejudicial, it affected only the amount of the verdict; therefore, we will order a reduc-

tion of the verdict in the amount of $1500 in lieu of a new trial.

Defendant also asserts in Specification No. 3 that part of the testimony of Adolph Lee, an assistant professor of mechanical engineering and a registered professional engineer, was inadmissible. Defendant specifies as error the admission of the following opinion testimony concerning the determination of rearward force on the basis of studies made by the Institute of Traffic and Transportation at the University of California and argues it affected the amount of the verdict:

> "Q. And are you familiar with any studies conducted by the University of California with respect to automobile accidents, that are carried out under controlled conditions?
>
> "A. Yes, sir, I am. This work is done by the Institute of Traffic and Transportation, which is part of the University of California at Berkeley.
>
> "Q. And have you actually seen films that have involved the actual colliding of two vehicles together with dummies mounted in each one of them behind the steering wheels?
>
> "A. Yes, I have, on several occasions.
>
> "Q. And have there been actual crash studies made under those conditions with published results?
>
> "A. Yes, sir.
>
> "Q. And are you familiar with those studies?
>
> "A. I can't say that I am familiar with all of them, but I am familiar with a number of them, yes.
>
> "Q. Now, with that background, Mr. Lee, I would like to inquire as to whether or not you have an opinion, based on accepted engineering principles and based on these studies made under controlled conditions with dummies mounted in the vehicles—do you have an opinion as to the number of pounds of force exerted

on the head and neck of an individual when struck as was the case in the hypothetical question, the Mercury by the Buick?

"A. Yes, I do, particularly with respect to the position of the dummy that would be in the position of the driver's seat in the forward vehicle, assumed to be standing still at the moment of impact.

"Q. And what is that opinion, Mr. Lee?

"MR. BRIGHT: I am going to object to that. This calls for opinion based on some controlled studies and dummies and is incompetent, irrelevant, and immaterial; there is insufficient foundation, not relevant to this action; does not prove or disprove any facts in this lawsuit.

"MR. HANSEN: We submit that we are asking for this based on engineering principles, your Honor, and tests which were actually conducted. This would be a matter of scientific knowledge.

"MR. BRIGHT: It is based on complete hearsay.

"THE COURT: Overruled. He may answer.

"THE WITNESS: In my opinion, the force exerted on the head of the dummy —or of a driver in that position—would be approximately 150 to 160 pounds. That's a rearward force."

Defendant concedes Mr. Lee's qualifications in regard to other opinion testimony given by him involving the accident. Evidence introduced to establish the witness's qualifications reveals that he has been involved in accident reconstruction work for 18 years and has taught related courses at the University of Minnesota since 1940, and indicates the witness was familiar with theories and principles required to make the necessary calculations on the basis of physical principles and laws involving motion, speed, force, velocity and acceleration and the relation of one to the other. Thus Professor Lee's position, education, background, special training, and experience,

not just his familiarity with the studies, all formed the basis and foundation for the trial court's admission of the testimony.