2007 ND 13

**Gary D. KLIMPLE, Plaintiff and Appellant**

**v.**

**Mark BAHL, Defendant and Appellee.**

**No. 20060195.**

Supreme Court of North Dakota.

Feb. 1, 2007.

Carey A. Goetz, Farhart Wolff, P.C., Minot, N.D., for plaintiff and appellant; submitted on brief.

Bradley J. Beehler, Morley Law Firm, Ltd., Grand Forks, N.D., for defendant and appellee; submitted on brief.

CROTHERS, Justice.

[¶ 1]   Gary D. Klimple appealed from a summary judgment dismissing his personal injury action against Mark Bahl. We affirm because Klimple presented insufficient admissible evidence to create a genuine issue of material fact on the issue of whether the motor vehicle accident proximately caused or aggravated Klimple's Kienbock's disease.

I

[¶ 2]   On October 1, 2001, Klimple and Bahl were involved in a motor vehicle acci-

dent in Minot in which Bahl's vehicle struck Klimple's vehicle. In April 2004, Klimple sued Bahl, alleging his left wrist and palm were fractured in the accident, Bahl negligently operated his vehicle, and Bahl's negligence proximately caused his injuries.

[¶ 3] After depositions were taken, Bahl moved for summary judgment in January 2006, claiming there were no genuine issues of material fact for trial because there was no evidence Bahl caused Klimple's injuries. Evidence was presented that a physician diagnosed Klimple after the accident as having preexisting Kienbock's disease. Klimple also had been seeking medical treatment for pain in his left wrist before the accident. A physician testified in a deposition that he could not say "with any reasonable degree of certainty" whether the Kienbock's disease was, or was not, caused by the car accident, but that preexisting Kienbock's disease "[c]ould have been aggravated by the car accident." Klimple testified in a deposition that his left wrist was thrust against the door panel during the collision and that he was healthy before the accident but was unable to work after the accident. The district court granted summary judgment in favor of Bahl, concluding Klimple "cannot prove that the automobile accident ... either caused his Kienbock's disease or aggravated his Kienbock's disease."

## II

[¶ 4] Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no disputed issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Ramsey Fin. Corp. v. Haugland*, 2006 ND 167, ¶ 12, 719 N.W.2d 346. Whether a district court properly granted summary judgment is a question of law this Court reviews de novo on the entire record. *Bernabucci v. Huber*, 2006 ND 71, ¶ 14, 712 N.W.2d 323. The party resisting a motion for summary judgment must present competent admissible evidence which raises an issue of material fact. *Peterson v. Zerr*, 477 N.W.2d 230, 234 (N.D.1991). The nonmoving party cannot rely on speculation, but must present enough evidence for a reasonable jury to find for the plaintiff. *Beckler v. Bismarck Pub. Sch. Dist.*, 2006 ND 58, ¶ 7, 711 N.W.2d 172.

[¶ 5] "Summary judgment is appropriate against parties who fail to establish the existence of a factual dispute on an essential element of a claim on which they will bear the burden of proof at trial." *Heart River Partners v. Goetzfried*, 2005 ND 149, ¶ 8, 703 N.W.2d 330. To succeed in his negligence action, Klimple must prove Bahl owed him a duty, Bahl failed to discharge that duty, and Klimple suffered an injury that was proximately caused by Bahl's negligence. *Perez v. Nichols*, 2006 ND 20, ¶ 6, 708 N.W.2d 884. "A proximate cause is a cause which, in natural and continuous sequence, produces the injury and without which the injury would not have occurred." *Rued Ins., Inc. v. Blackburn, Nickels & Smith, Inc.*, 543 N.W.2d 770, 773 (N.D.1996). When a defendant's negligence aggravates a preexisting injury, the defendant must compensate the victim for the full extent of the aggravation but is not liable for the preexisting condition itself. *Olmstead v. First Interstate Bank*, 449 N.W.2d 804, 808 (N.D.1989). Negligence involves questions of fact and is generally inappropriate for summary judgment unless the evidence is such that a reasonable factfinder can reach only one conclusion. *Beckler*, 2006 ND 58, ¶ 9, 711 N.W.2d 172.

[¶ 6]   In his deposition, Klimple agreed that the only injury he claimed was caused by the accident was to his left wrist, and during the summary judgment proceedings, the parties focused solely on the narrow question of whether the October 1, 2001, accident caused or aggravated Klimple's Kienbock's disease.  Kienbock's disease is the death of a small bone in the wrist from an unknown cause, and has been technically defined as "osteonecrosis of the lunate bone resulting from unknown etiology, although can occur after trauma." *PDR Medical Dictionary* 516 (2nd ed.2000).  Unlike professional malpractice actions, there generally is no requirement in ordinary negligence cases for expert testimony to establish the elements of the tort.  *See Johansen v. Anderson*, 555 N.W.2d 588, 594 (N.D.1996).  In some circumstances, however, expert testimony may be required to resolve issues in an ordinary negligence action.  *See Bachmeier v. Wallwork Truck Ctrs.*, 507 N.W.2d 527, 535 (N.D.1993); *Day v. General Motors Corp.*, 345 N.W.2d 349, 358 (N.D. 1984).  This Court has indicated expert testimony is required if the issue "is beyond the area of common knowledge or lay comprehension," *Leno v. Ehli*, 339 N.W.2d 92, 99 (N.D.1983), or the issue "is not within the ordinary experience of the jurors." *Holecek v. Janke*, 171 N.W.2d 94, 103 (N.D.1969).  Klimple has not argued the causal relationship between the accident and his Kienbock's disease is a matter within the common knowledge or comprehension of a layperson.  *See, e.g.*, 11A *Blashfield Automobile Law and Practice: Trial Evidence* § 431.5, at 384 (4th ed.2004) (footnote omitted) (*"Blashfield"*) ("Opinions on most matters related to bodily injury are naturally beyond the ken of the factfinder, and thus are properly stated by qualified medical experts.").  Consequently, expert medical testimony was required to establish proximate cause in this case.

[¶ 7]   The record reflects Klimple has owned a tree service in Minot since 1998 and he and his wife trim and remove trees and grind tree stumps for customers.  On September 11, 2001, Klimple went to the clinic complaining of discomfort in his left wrist.  He "denie[d] any direct trauma"; the doctor diagnosed him with tendonitis and prescribed heat, rest, and medication.  On September 19, 2001, Klimple returned to the clinic, again complaining of pain in his left wrist.  The doctor assessed Klimple as having tendonitis and stated in the clinic note that "I do not believe there is any reason for x-rays without any evidence of trauma."

[¶ 8]   When the accident occurred on October 1, 2001, Klimple was driving with his left hand on the steering wheel and, upon impact, his left wrist "kind of bounced against the door and the steering wheel."  Klimple did not perceive any injuries at the scene of the accident and did not report any to the police.  Klimple testified that, on the following day, his left wrist was "stiff" and he "couldn't even move my hand to speak of."  Klimple made an appointment to meet with an orthopedic surgeon, Dr. Uthus, on October 8, 2001.  After reviewing an X-ray, Dr. Uthus diagnosed a fracture in Klimple's left wrist and the presence of "[p]reexisting Kienbock's disease."  After placing Klimple's wrist in a cast until December 2001 and ordering physical therapy, Dr. Uthus determined Klimple needed surgery to repair the injury and referred him to Dr. Jeffery Keim, a plastic surgeon and hand specialist.  Dr. Keim ordered an MRI of Klimple's wrist which confirmed Dr. Uthus's diagnosis of Kienbock's disease, and Dr. Keim performed surgery in January 2002.

[¶ 9] In his deposition, Dr. Keim testified about the nature of Kienbock's disease and whether the accident caused or aggravated Klimple's condition:

Q. Okay. What's the cause of Kienbock's?

A. It's avascular necrosis, loss of the blood supply felt to be due to fractures and nonunion of fractures.

Q. Is this something that a person like Mr. Klimple could get in a car accident?

A. Yes. One of the main theories is trauma and fractures in the lunate.

Q. Okay. And this car accident was on October 1, 2001, and you first saw him December of that same year?

A. Yeah. The car accident was October 1, 2001, and I saw him in December.

Q. Is that enough time for the Kienbock's disease to develop to Stage 3?

A. Well, Dr. Uthus felt that he had preexisting Kienbock's.

Q. And you agreed to that diagnosis?

A. At the time that I saw him, yes.

Q. Doctor, would you agree with me that patients can have Kienbock's disease months or years before seeking treatment?

A. Yes.

Q. Would you agree that it's more prevalent in people that use their hands for work? Heavy labor?

A. I wouldn't say that. It's more prevalent in men and it's more commonly related to trauma, repeated trauma, repetitive type trauma.

. . . .

Q. Doctor, is it possible that the motor vehicle accident may have caused the increase in Mr. Klimple's pain complaints?

A. Yes.

Q. Is it also possible that that—this increase in his pain complaints reflect progress of his preexisting Kienbock's disease?

A. Possibly, yes.

Q. Does the lunate fracture precede the Kienbock's disease?

A. Yes.

Q. He must have had a broken lunate at some point?

A. Well, the fractures of the lunate are a part of the diagnosis of Kienbock's because the fractures interrupt the blood supply and that results in the necrosis, or dying of the bone.

Q. So I can understand, I think what you're saying is the lunate is fractured and cuts off the blood supply?

A. Right.

Q. And that's how the Kienbock's develops?

A. Yes.

Q. If he had preexisting Kienbock's disease, he must have fractured the lunate at some time before the car accident?

A. Yes.

. . . .

Q. Let me ask it to you this way then. Can you say with any reasonable degree of certainty whether Kienbock's disease was caused in the car accident or not?

A. No.

Q. You just don't know; right?

A. No.

Q. You're kind of the repairman after the fact; right?

A. Right.

Q. And I'm not trying to degrade your profession by saying that.

A. No. No. I can't say whether it was caused in the car accident. Essentially he has a diagnosis of Kienbock's.

Could have been aggravated by the car accident.

Q. You just don't know; correct?

A. Right.

Q. And at Stage 3, I think you told me that he's going to need surgery, anyway; right?

A. Right.

Q. So he would have been at Stage 3 without the car accident, he still would have needed surgery; right?

A. Yes. Yes.

[¶ 10] In his deposition, Klimple testified his condition became worse after the accident:

Q. Okay. Mr. Klimple, are you able to perform all your daily and customary activities?

A. No.

Q. What can't you do?

A. Run a saw for a full day.

Q. Again, you're talking about chain saw?

A. Chain saws, yes.

Q. And you were able to do that before the accident?

A. Yes.

Q. How long—before the accident how often did you have to run a chain saw all day?

A. Every day.

. . . .

Q. Anything else that you can't do now that you could do before the accident?

A. Well, like I said, I used to be able to hold onto branches and—out of the bucket and control them and just let them down, but I can't do that anymore. I use a rope now.

Q. Anything else?

A. I can't climb. I used to climb. I can't do that anymore. Because I won't trust it with one hand.

Q. Climb what?

A. Trees. In a tight yard where you can't get a truck in, I used to climb and take them down.

[¶ 11] Bahl argues, and the district court ruled, Klimple cannot establish the causation element of negligence because the record lacks medical testimony stating "to a reasonable degree of medical certainty" that Klimple's Kienbock's disease was either caused by or aggravated by the accident.

[¶ 12] This Court has long required that expert medical opinions be expressed in terms of reasonable medical certainty, not mere possibilities. *See, e.g., Kunnanz v. Edge,* 515 N.W.2d 167, 172 (N.D.1994); *Nelson v. Trinity Med. Ctr.,* 419 N.W.2d 886, 892 (N.D.1988); *Smith v. American Family Mut. Ins. Co.,* 294 N.W.2d 751, 763–64 (N.D.1980); *Dehn v. Otter Tail Power Co.,* 251 N.W.2d 404, 412 (N.D.1977); *Holecek,* 171 N.W.2d at 100; *Grenz v. Werre,* 129 N.W.2d 681, 689 (N.D. 1964); *Vaux v. Hamilton,* 103 N.W.2d 291, 295 (N.D.1960); 11A *Blashfield* § 431.5, at 394–95 (footnotes omitted) ("The opinion of causation must be adequately founded, and generally must be stated in terms of reasonable medical certainty."). Although hypertechnical words are not necessary for admission of expert medical testimony, the test for admissibility "is whether the expert's testimony demonstrates the expert is expressing a medical opinion that is more probable, or more likely than not." *Kunnanz,* 515 N.W.2d at 173. Here, Dr. Keim testified only that the accident "[p]ossibly" caused or "[c]ould have" aggravated Klimple's Kienbock's disease. Dr. Keim's testimony does not constitute an admissible medical opinion that the Ki-

enbock's disease was, more likely than not, caused by or aggravated by the accident.

[¶ 13] Klimple acknowledges the "equivocal" nature of Dr. Keim's testimony on causation, but argues that the doctor's testimony, considered together with his own testimony of the condition of his wrist before and after the accident, raises a genuine issue of material fact on proximate causation. Klimple relies on cases from other jurisdictions holding proximate cause in an ordinary negligence case may be established by medical evidence of "possible" causation combined with other evidence, including plaintiffs' testimony about their physical condition before and after an accident. *See, e.g., Guyer v. Mayor and Aldermen of the City of Savannah*, 162 Ga.App. 598, 292 S.E.2d 445, 448 (1982) (medical testimony that injury "may be causally related" to collision coupled with plaintiff's testimony about effect on her work precluded summary judgment dismissal); *Roberson v. Hicks*, 694 N.E.2d 1161, 1163 (Ind.Ct.App.1998) (internal citations omitted) ("Standing alone, an expert opinion which lacks reasonable probability is not sufficient to support a verdict ... However, 'an expert's opinion that something is "possible" or "could have been" may be sufficient to sustain a verdict or award' when rendered in conjunction with other, probative evidence establishing the material factual question to be proved."); *see also* 11A *Blashfield* § 431.5, at 396–97 (footnotes omitted) ("it has been held that [medical] opinions may be stated in terms such as 'might have caused' or 'could have caused', where supported by other competent proof of causation"). We decline to adopt the reasoning of these cases because it conflicts with our caselaw on the admissibility of expert medical testimony and the competency of layperson testimony.

[¶ 14] In *Asch v. Washburn Lignite Coal Co.*, 48 N.D. 734, 735, 186 N.W. 757, Syll. 6 (1922) (emphasis added), this Court held that "[t]he injured person is a competent witness to testify to his feelings, pains, and symptoms, as well as to all the characteristics of the injury, so far as the same are perceptible to the senses, and *do not require the exercise of scientific skill and knowledge.*" *See also Cain v. Stevenson*, 218 Mont. 101, 706 P.2d 128, 131 (1985) ("lay testimony is not sufficient to establish cause for those aspects of an injury not apparently related to the accident in question"). We conclude the causal relationship between the accident and Klimple's Kienbock's disease is not a matter within the common knowledge or comprehension of a layperson. The incongruity of allowing equivocal medical testimony combined with layperson testimony to prove causation when the causation issue requires admissible expert testimony is explained in *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858, 864 (1978):

> A doctor's testimony can only be considered evidence when he states that the conclusion he gives is based on reasonable medical certainty that a fact is true or untrue. A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a "possible" cause of death.

*See also Oxendine v. State*, 528 A.2d 870, 873 (Del.1987) (same); *Topp v. Leffers*, 838 N.E.2d 1027, 1036 (Ind.Ct.App.2005) (plaintiff's testimony in conjunction with expert medical opinions was not sufficient to prove causation because plaintiff's testimony merely established the possibility of causation and the doctor's opinions lacked reasonable medical certainty); *Baughman v. Pina*, 200 Or.App. 15, 113 P.3d 459, 460 (2005) ("When the element of causation

involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that there is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries.... The rule prevents jurors from speculating about causation in cases where that determination requires expertise beyond the knowledge and experience of an ordinary lay person.").

[¶ 15]   Dr. Keim's deposition testimony, considered together with Klimple's deposition testimony, raise no more than speculation and conjecture about the cause or aggravation of Klimple's Kienbock's disease.   Based on the narrow issue presented in this case, we agree with the district court that Klimple failed to raise a genuine issue of material fact that the accident proximately caused or aggravated Klimple's Kienbock's disease.

### III

[¶ 16]   The summary judgment is affirmed.

[¶ 17] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, concurring in part and dissenting in part.

[¶ 18]   I, respectfully, concur in part and dissent in part.

[¶ 19]   The issue is whether summary judgment was proper.   Rule 56(c), N.D.R.Civ.P., provides that, if a motion for summary judgment is made,

> Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that any party is entitled to a judgment as a matter of law.

Rule 56(e) provides:

> Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein.   Sworn or certified copies of all papers or parts thereof referred to in an affidavit must be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.   If a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.   If the adverse party does not so respond, summary judgment, if appropriate, must be entered against the adverse party.

Summary judgment is a procedural device for deciding a case when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. *Charles McCauley P'ship v. Tyrone Twp.,* 2004 ND 214, ¶ 3, 689 N.W.2d 410.

A party moving for summary judgment has the initial burden of showing that there is no dispute as to either the material facts or the inferences to be drawn from undisputed facts.   In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion, and he must be given the benefit of

all favorable inferences which can be reasonably drawn from the evidence.

*Id.* (citations omitted).

[¶ 20]   Our Court has held, under Rule 56(e), N.D.R.Civ.P., that " 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.' "   *Steinbach v. State,* 2003 ND 46, ¶ 12, 658 N.W.2d 355 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).   In *Black v. Abex Corp.,* 1999 ND 236, ¶ 19, 603 N.W.2d 182 (citing *Celotex,* at 325, 106 S.Ct. 2548), we said:

> If the record, after discovery, contains no evidence to support an essential element of the plaintiff's claim, there is no "evidence" the defendant can point to in support of its assertion there is no such evidence.   In such a case the rule allows the defendant to put the plaintiff to its proof, without the necessity of a full trial, by merely "pointing out" to the trial court the absence of evidence to support the plaintiff's case.

[¶ 21]   In support of his motion for summary judgment, Bahl submitted the discovery depositions of Dr. Jeffery R. Keim and Klimple, and copies of Dr. Carey Welsh's notes recorded on September 11, 2001, and on September 19, 2001, which were attached as exhibits A and B to his Reply Brief Regarding Defendant's Motion for Summary Judgment.   Bahl contends that the testimony given in these two depositions establishes as a matter of law there is no competent admissible evidence that the automobile accident caused or aggravated Klimple's Kienbock's disease.

[¶ 22]   The first question is whether the movant has made a showing that demonstrates without regard to the opposing party's response, there is no genuine issue of material fact, and he is entitled to judgment as a matter of law.   *Sagmiller v. Carlsen,* 219 N.W.2d 885, 891 (N.D.1974); *see also Brown v. North Dakota State Univ.,* 372 N.W.2d 879, 881 (N.D.1985).

[¶ 23]   Dr. Keim's deposition was taken as a discovery deposition by Bahl. Dr. Keim was asked numerous questions by Bahl concerning his medical opinions about Klimple's Kienbock's disease.   Our Court has an established rule regarding expert testimony in a medical context, which is that "[a] medical expert is qualified to express an opinion to a medical certainty, or based on medical probabilities only, but not an opinion based on mere possibilities." *Vaux v. Hamilton,* 103 N.W.2d 291, 295 (N.D.1960); *Nelson v. Trinity Med. Ctr.,* 419 N.W.2d 886, 892 (N.D.1988); *Dehn v. Otter Tail Power Co.,* 251 N.W.2d 404, 412–13 (N.D.1977); *Kunnanz v. Edge,* 515 N.W.2d 167, 172–73 (N.D.1994).   Therefore, our decisions have held that the evidentiary standard for admission of an expert medical opinion does not require it be couched to a "reasonable degree of medical certainty," but is satisfied if the medical expert opinion is expressed to a reasonable degree of probability.   Our Court has held that it is not necessary to continually repeat these evidentiary standards if the expert testimony demonstrates the opinion is stated, at least, that it is more probable, or more likely than not.   *Kunnanz,* 515 N.W.2d at 173.

[¶ 24]   A careful reading of Dr. Keim's deposition reveals that Dr. Keim was never asked to state his opinions to a reasonable degree of medical certainty or a reasonable degree of medical probability. Therefore, none of his opinions regarding the cause of Klimple's Kienbock's disease, whether it was caused by the automobile accident or whether it was aggravated by the automobile accident are admissible in evidence.   In fact, Bahl's attorney asked Dr. Keim for "possibilities" or to speculate:

Q. Doctor, is it possible that the motor vehicle accident may have caused the increase in Mr. Klimple's pain complaints?

. . . .

Q. Is it also possible that that—this increase in his pain complaints reflect progress of his preexisting Kienbock's disease?

The majority of Bahl's attorney's questions eliciting an expert medical opinion have no stated evidentiary standard:

Q. . . . What's the cause of Kienbock's?

. . . .

Q. Is this something that a person like Mr. Klimple could get in a car accident?

. . . .

Q. Is that enough time for the Kienbock's disease to develop to Stage 3?

. . . .

Q. Does the lunate fracture precede the Kienbock's disease?

. . . .

Q. If he had preexisting Kienbock's disease, he must have fractured the lunate at some time before the car accident?

Only at one point in Bahl's attorney's questioning did he get even close to properly asking for a medical expert opinion when he asked:

Q Let me ask it to you this way then. Can you say with any reasonable degree of certainty whether Kienbock's disease was caused in the car accident or not?

This question was not asked to a reasonable degree of "medical" certainty and clearly left out the question of whether the doctor could state an opinion to a reasonable degree of medical probability. With regard to whether the doctor had an opin-ion whether the automobile accident aggravated Klimple's Kienbock's disease, caused pain, or caused the fracture of the lunate to a reasonable degree of medical certainty or medical probability, the questions were never asked.

[¶ 25] Bahl's attorney also took the deposition of Klimple. In his deposition, Klimple testified he had not sustained any trauma to his left wrist before the automobile accident; he saw Dr. Welsh twice in September 2001, for pain in his left wrist, and was told he had tendonitis; that he was able to do all of his work for his tree business; that, at the time of the accident, his left wrist bounced against the door and the steering wheel; that the very next day, his left wrist was stiff and he could not even move his hand; that he had to quit working that day; that he made an appointment with Dr. David Uthus and told the nurse his wrist injury was caused by a car accident; and that Dr. Uthus diagnosed a longitudinal fracture of his lunate bone of his left wrist and the presence of Kienbock's disease. Klimple testified at his deposition:

Q. He said it was Kienbock's disease?

A. He mentioned Kienbock's disease was there and it was aggravated when this fracture came in that I want to call the lunate bone? I don't know.

Q. It sounds right to me, but I don't know, either.

Klimple's complaint alleges he sustained an injury to his left wrist, including a fracture. Klimple testified the day after the accident he could not even move his left wrist and could not work. Before the accident he was able to work, lifting heavy branches and chainsaws. There is no evidence that Klimple had a fracture of the lunate bone before the automobile accident. Bahl attached to his Reply Brief Regarding Defendant's Motion for Sum-

mary Judgment as exhibits A and B, Dr. Welsh's notes of Klimple's visits on September 11, 2001, and September 19, 2001. Dr. Welsh's diagnosis was tendonitis, and he specifically noted that there was no evidence of trauma to the wrist. Furthermore, the note on September 11, 2001, stated that Klimple's range of motion was intact and that there was tenderness of the dorsal wrist along the extensor tendons. "Dorsal" means "pertinent to the back;" "extensor" means "[a] muscle that extends a part;" and "tendon" means "[f]ibrous connective tissue serving for the attachment of muscles to bones and other parts." Am.Jur.3d *Proof of Facts, Taber's Cyclopedic Medical Dictionary* 525, 639, 1831 (16th ed.1989). On September 19, 2001, Dr. Welsh noted that Klimple had a "dull ache" and that it was at the left upper hand and base of the second metacarpal area, which is the second finger starting with the thumb as number one. Klimple had "tenderness" "proximal to the thenar eminence." "Thenar" means "[c]oncerning the palm" and "thenar eminence" means "[a] prominence at the base of the thumb." Am.Jur.3d *Proof of Facts, Taber's Cyclopedic Medical Dictionary*, at 1846. These notes do not refer to any pain or tenderness over the "lunate bone." The notes are inconsistent with a longitudinal fracture of the lunate bone. The diagnosis was "tendonitis," which is defined as inflammation of the tendon. *Id.* at 1831.

[¶ 26] As recognized by the majority, an injured person can testify as to his health before an automobile accident and to his health after an automobile accident. *See Asch v. Washburn Lignite Coal Co.*, 48 N.D. 734, 755–56, 186 N.W. 757, 765 (1922); *see also State v. Miller*, 530 N.W.2d 652, 656 (N.D.1995) (holding that "[w]itnesses who are not experts in medicine may still testify regarding the seriousness of wounds when the facts testified to are such that '[a]ny reasonable person with

common sense is capable of expressing a view on such matters without first having to be qualified or treated as an expert witness'" (quoting *State v. Schimetz*, 328 N.W.2d 808, 815 (N.D.1982))). In the present case, Klimple himself and Dr. Welsh's notes provide evidence that Klimple did not have a fractured lunate bone before the accident. The evidence is that Klimple had a fractured lunate bone after the accident. Klimple believes the fracture was caused by his wrist striking the car door and steering wheel.

[¶ 27] The question presented is: When is lay opinion testimony permissible on the question of causation and expert opinion testimony not required? We should decline to adopt an absolute rule which would make expert medical testimony necessary on proximate cause of a party's injuries when such causation is within the usual and ordinary experience of the average person. Each case will differ and should be evaluated on its facts. To the extent that the majority opinion can be read broadly to require medical testimony on the proximate cause of a party's injuries, which are within the common experience and knowledge of laypersons, sustained in an automobile accident, I disagree.

[¶ 28] I agree with the courts that have concluded plaintiffs' and other lay witnesses' testimony is competent to establish causation regarding various illnesses and injuries. *Choi v. Anvil*, 32 P.3d 1 (Alaska 2001); *Dodge–Farrar v. American Cleaning Services Company, Inc.*, 137 Idaho 838, 54 P.3d 954 (Ct.App.2002); *see* 2 Wigmore, *Evidence* § 568(1), at 780–83 (Chadbourn Rev.1979); *see also* 66 A.L.R.2d 1082, 1126 § 8 (1959). The Alaska Supreme Court held: "Our case law requires expert testimony only when the nature or character of a person's injuries require the special skill of an expert to help present

the evidence to the trier of fact in a comprehensible format." *Choi*, 32 P.3d at 3. The Idaho Court of Appeals held: "[W]e conclude that a layperson may testify to the causation of medical symptoms or of injuries where such causation is within the usual and ordinary experience of the average person, and also satisfies I.R.E. 701." *Dodge–Farrar*, 54 P.3d at 958.

[¶ 29] "Whether a breach of a duty is the proximate cause of an injury depends on the facts and circumstances of each case and is a question of fact for the trier of fact." *Rued Ins., Inc., v. Blackburn, Nickels & Smith, Inc.*, 543 N.W.2d 770, 773 (N.D.1996). "The existence of proximate cause is a fact question unless the evidence is such that reasonable minds can draw but one conclusion." *Id.* at 774. Issues of negligence, proximate cause, and comparative fault are therefore questions of fact for the trier of fact. *Butz v. Werner*, 438 N.W.2d 509, 516 (N.D.1989). Summary judgment is rarely appropriate on the issue of proximate cause which is so dependent on the development of the facts and the evidence. *See Kimball v. Landeis*, 2002 ND 162, ¶ 7, 652 N.W.2d 330.

[¶ 30] I do agree with the majority, that a layperson is not a competent witness when the injury or disease requires the exercise of scientific skill and knowledge. I also agree that the issue of whether Klimple's Kienbock's disease was caused or aggravated by the automobile accident is the type of issue requiring expert medical testimony. However, the majority opinion appears to hold that the movant Bahl has proven a factual negative with regard to all of Klimple's left wrist injuries—no proximate cause. The focus of this summary judgment is whether there is evidence that the automobile accident caused Klimple's left wrist injuries. All inferences from the facts are to be drawn in favor of the nonmoving party.

*Charles McCauley P'ship*, 2004 ND 214, ¶ 3, 689 N.W.2d 410. It is accurate that Klimple has not provided any admissible medical expert evidence that his Kienbock's disease was caused or aggravated by the automobile accident. On that issue, I agree with the majority's conclusion summary judgment is appropriate.

[¶ 31] The majority, however, overlooks the evidence in the deposition of Klimple.

Q. What happened, in your opinion, in the accident that caused your wrist to be injured?

A. Well, when you hit, it kind of bounced against the door and the steering wheel. Right here on this part.

Q. Was your hand on the steering wheel at the time or on the door?

A. On the steering wheel.

Q. Okay. How did it bounce then?

A. Just kind of slapped off and hit the door.

Q. So it wasn't like the steering wheel spun around or anything?

A. No.

Q. So it came off the steering wheel and hit the side of the door?

A. Yeah.

. . . .

Q When did you first see a doctor after this accident?

A. I tried to—the first time I seen the doctor was the 8th of October, but I had tried to get an appointment with Dr. Uthus and he was booked up. That was the first open date. But you know how it is when you don't have insurance, you think, well, it's just a sprain, it's going to be all right, nothing big.

. . . .

Q. Now, is the only injury you're claiming in this accident to your left wrist?

A. Correct.

. . . .

Q. Did your left wrist bother you at the scene of the accident?

A. No.

Q. Okay. When did it start bothering you?

A. I went to work the next morning and I was going to pick up one of those seven and a half pound chain saws and do some cutting, and I couldn't even move my hand to speak of. It was stiff, but I picked it up and it started bothering so I just thought, well, it's just sprained, it will be all right and went home.

. . . .

Q. And then I think you told me you went in to Dr. Uthus a week later?

A. The 8th, yes.

Q. Okay. What kind of problems did you tell Dr. Uthus you had?

A. I told him what had happened and everything, and he took an x-ray of it and found that there was—I can't pronounce these.

Q. Neither can I.

A. Something about a lateral bone or—I don't know. Anyway, it was fractured in there. And he put it in a cast and said that it should be hopefully better in four weeks. He said that it was Kienbock's disease, it's called, and the finger was slipping down and he said he had to cast it to immobilize it. And he casted it and I had it on for I think probably roughly two weeks and went back in and had it x-rayed again. And he recasted it again; the fracture hadn't done anything.

After he did that, it was into December already, and he took the cast off and he had me go to therapy three times a week. And that wasn't doing anything. When I went back to see him again, he said, no, it's not doing nothing; I'm go-ing to turn you over to Dr. Keim. He's a plastic surgeon and great hand specialist, and he said he could take care of it and do the surgery.

. . . .

Q. That's my understanding, too. The first time you went in to see Dr. Uthus, U-t-h-u-s, this is a patient assessment form that you completed; correct?

A. Yes.

Q. And it's a two-page document; right?

A. Correct.

. . . .

Q. And the reason for the visit today was you put in left wrist; correct?

A. Correct.

Q. Is that your handwriting that says auto accident?

A. That's the nurse.

Q. And then the date of onset, 10–1–01, did you fill that in or the nurse?

A. No, the nurse.

. . . .

Q. You just put in "left wrist" and you didn't put in the date of onset; correct?

A. No. I told her.

Q. And that was on the 8th; correct?

A. Correct.

. . . .

Q. But he did cast it the first day?

A. Yes.

Q. He said it was Kienbock's disease?

A. He mentioned Kienbock's disease was there and it was aggravated when this fracture came in that I want to call the lunate bone? I don't know.

. . . .

Q. And Uthus referred you to Keim?

A. Correct.

Q. K-e-i-m. Okay. He does the surgery?

A. Yes.

Q. And there's a screw or something put in your hand, I think I read someplace?

A. Yes.

Q. Is that screw still in there?

A. Yes.

Q. Is that ever going to come out?

A. No.

Q. Do you know what the screw is in there for?

A. He did a bone graft on that fracture and put a screw in there for support.

Q. To hold the bone in place while it was grafting on?

A. Yes.

Klimple's deposition exhibit 8 lists all of his treatment and the costs for the treatment. With regard to his work, Klimple testified he owns a tree service, which involves the trimming, stump removal, and the taking down of big trees. He testified he is right-handed, but that in his work he uses both hands.

[¶ 32] Klimple explained in his deposition that he used to be able to use his left hand to hold a branch while cutting it off, and he no longer has the strength to do that. He also testified that when he carries anything heavy his left wrist "[j]ust knots up" and he gets "writer's cramps." He has stiffness in the mornings in the left wrist and cannot pick up anything thin from a flat surface. He testified that since the surgery, the pain is gone but he still has some swelling in the wrist.

[¶ 33] I am of the opinion that Klimple's testimony about the trauma to his left wrist at the time of the accident and the symptoms in his left wrist immediately the next day of pain, stiffness, immobility, and lack of strength are within the usual and ordinary experience of the average person. I also am of the opinion that Klimple's testimony that he was able to use his equipment and take down trees using his left wrist before the accident and that the day after the accident he could not is evidence from which a reasonable inference can be drawn that the automobile accident proximately caused the symptoms of pain, stiffness, immobility, and lack of strength which he perceived in his left wrist. The further away in time the symptoms and treatment become, the more tenuous the causal relationship. However, I am of the opinion that there is enough evidence of the injury proximate enough to the automobile accident. Just where the line should be drawn requiring expert testimony in this case is a decision for the trial court. However, the symptoms and treatment that occurred shortly after the traumatic event, are within the common knowledge and experience of the average person and Klimple's cause of action should survive summary judgment.

[¶ 34] I would affirm the summary judgment on the issue of proximate cause or aggravation of Kienbock's disease because its cause or aggravation requires medical expert evidence and there is none in this record. I would reverse the summary judgment, however, with respect to Klimple's claim for compensation for symptoms and medical treatment immediately following the automobile accident and subsequently unrelated to the Kienbock's disease.

[¶ 35] Mary Muehlen Maring